DAVIS, Senior Circuit Judge,
concurring in part and dissenting in part:
My friends in the majority affirm the district court’s judgment against Jean Paul Alvarado, who was convicted of violating 21 U.S.C. § 841(a)(1) and sentenced to a mandatory minimum of twenty years’ imprisonment pursuant to 21 U.S.C. § 841(b)(1)(C) for distributing heroin to Eric Thomas that resulted in Thomas’s déath. The majority holds that the district court’s jury instructions as to the meaning of § 841(b)(l)(C)’s requirement that “death ... results from” the use of the distributed substance were' adequate and that the district court neither abused its discretion nor committed plain error in its instructions. Although the question presented is close, I am persuaded that Alvarado did not receive the minimally fair trial the Constitution guarantees him, one in which a properly instructed jury holds the government to its obligation to prove the elements of the charged offense beyond a reasonable doubt. Accordingly, I respectfully dissent.
For the reasons that follow, I would vacate the judgment of' conviction under § 841(b)(1)(C) and remand with instructions that Alvarado either (1) be accorded a new trial or (2) be resentenced without a new trial on the lesser included § 841(a)(1) distribution offense. In all other respects, I join the majority in affirming the judgment of the district court.
I.
Alvarado, challenges, among other things, the adequacy of the district court’s jury instructions as to the meaning of the statutory phrase “results from.” At trial, the district court instructed the jury that it must “determine whether the government has proved beyond a reasonable doubt that death resulted from the use of [a substance that Alvarado distributed].” J.A. 947. This language tracked § 841(b)(l)(C)’s requirement that a sentencing enhancement applies when “death ... results from the use of’ the distributed substance. Alvarado contends that *253 these jury instructions were inadequate and therefore erroneous and prejudicial.
A.
“Whether jury instructions were properly given is a question of law.” United States v. Herder, 594 F.3d 352, 359 (4th Cir.2010) (quoting United States v. Morrison, 991 F.2d 112, 116 (4th Cir.1993)). We ordinarily review a court’s decision to give particular instructions and the content of those instructions for abuse, of discretion. United States v. Kivanc, 714 F.3d 782, 794 (4th Cir.2013); United States v. Russell, 971 F.2d 1098, 1107 (4th Cir.1992). The .majority suggests, however, that because Alvarado failed to object to the district court’s decision not to clarify or supplement its instructions in response to the jury’s questions during deliberations, our review should be limited to that of plain error. I disagree and believe that review for abuse of discretion is warranted.
Prior to trial, Alvarado proposed alternative jury instructions regarding § 841(b)(l)(C)’s causation element. The district court denied Alvarado’s proposed instructions and instead decided that it would “instruct the jury only on what the statutory language is”—that is, it would instruct the jury only that § 841(b)(1)(C) requires “that death resulted from the use of [the] heroin.” J.A. 481, 486-87. Alvarado expressly objected both to the court’s denial of his proposed instructions and to the court’s decision to “use[ ] the statutory language only” in instructing the jury on this matter. J.A. 487. Whether or not the former objection was sufficient to preserve the issue, see Jones v. United States, 527 U.S. 373, 387, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), in my.view, the latter objection, which Alvarado raised before the jury retired, effectively preserved for appeal the issue of whether the “results, from” instruction was adequate, notwithstanding Alvarado’s failure to object when the court later declined to elaborate on the meaning of the statutory language. See id. (recognizing that a party that objects to a jury instruction before the jury retires may challenge the instruction on appeal); Fed. R.Crim.P. 30(d), 51(b).
In analogous situations, this Court has “held that when a party moves in' limine to exclude evidence, the party need not renew its objection when evidence within the scope of the motion is introduced at trial.” United States v. Cone, 714 F.3d 197, 225 (4th. Cir.2013) (Wynn, J., concurring in part and dissenting in part) (citing United States v. Ruhe, 191 F.3d 376, 383 n. 4 (4th Cir.1999)); see also United States v. Williams, 81 F.3d 1321, 1325 (4th Cir. 1996) (“[M]otions in limine may serve to preserve issues that they raise without any need for renewed objections at trial.”); Fed.R.Evid. 103(b). Similarly, Alvarado’s objection to the adequacy of the “results from” instruction .prior to deliberations most assuredly preserved the issue for appeal, -and Alvarado did not need to renew this objection when the district court provided, its instructions and later declined to expand on them. Accordingly, I would -review -for abuse of discretion.[1]
*254 B.
In assessing whether the district court abused its discretion, this Court must “review the entire jury charge to determine whether the jury was properly instructed on the elements of the offenses and the accused’s defenses.” Herder, 594 F.3d at 359. “By definition, a court ‘abuses its discretion when it makes an error of law.’ ” “United States v. Moye, 454 F.3d 390, 398 (4th Cir.2006) (en banc) (quoting United States v. Prince-Oyibo, 320 F.3d 494, 497 (4th Cir.2003)). The key inquiry is “whether' the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party.” Kivanc, 714 F.3d at 794 (quoting Noel v. Artson, 641 F.3d 580, 586 (4th Cir.2011)).
Alvarado contends that the jury instructions did not adequately convey that § 841(b)(1)(C) requires a showing that Thomas’s use of the heroin that Alvarado distributed was either independently Sufficient to cause Thomas’s death or a but-for cause of Thomas’s death: Alvarado bases this argument on the Supreme Court’s decision in United States v. Burrage, — U.S. —, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014), which the Court decided after the jury’s verdict but before sentencing. In Burrage, the Court considered, among other things, whether a defendant “may be convicted under [§ 841(b)(1)(C)’s] ‘death results’ provision ... when the use of the controlled substance was a ‘contributing cause’ of the death.” Id. at 886. Acknowledging that the Controlled Substances Act does not. expressly define the phrase “results from,” the Court determined that the phrase’s “ordinary meaning” requires actual, or but-for, causation. Id. at 887-88. The Court held that, “at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim’s death ... a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death.” Id. at 892, Thus, the Court in Burrage recognized that a court may not impose § 841(b)(1)(C)’s mandatory minimum sentence based on a jury finding that use of the drug distributed by the defendant merely contributed to someone’s death; rather, use of the drug must have been an independently sufficient cause or a but-for cause of the death for the penalty enhancement to apply. See id. Accordingly, Alvarado argues that the jury instructions ' provided at his trial, which merely directed the jury to determine whether “death resulted from” Thomas’s use of heroin, were erroneous, i.e., prejudi-cially incomplete.
The government maintains that the jury instructions could not have been erroneous because they precisely stated the controlling law—that is, the district court merely tracked the language of the Controlled Substances Act in instructing the jury to determine whether death resulted from the use of a controlled substance. Further, the government argues that the meaning of the language “results from” is clear and unambiguous in light of the Supreme Court’s recognition in Burrage that but-for causation is the “ordinary meaning” of the phrase. See id. at 887-88. In other words, the government contends that the statutory language is plain on its face *255 and therefore did not require further explanation. I disagree.
Significantly, the relevant inquiry is whether the jury instructions “adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party.” Kivanc, 714 F.3d at 794 (emphasis added) (quoting Noel, 641 F.3d at 586). It is therefore not enough for jury instructions merely to parrot the controlling law where the statutory text itself may mislead or confuse the jury. My friends in the majority and I are in agreement on this matter, as they expressly recognize that, in circumstances “where the record might suggest that the decedent ingested heroin but might have died nonetheless from the effects of other substances, a court’s refusal to clarify the phrase ‘results from’ might become a problem.” Ante at 249. The majority explains that, “[i]n such an ambiguous scenario, a jury, without a clarifying instruction, might be allowed to apply the penalty enhancement under § 841(b)(1)(C) even if heroin was not a but-for cause of death.” Id. at 249. The majority and I differ, however, in our analyses of whether this case presents such an “ambiguous scenario,” as I conclude (based on my study of the entire record) that it does, while the majority determines that it does not.
By failing to clarify the causation requirement in its jury instructions, the district court (acting without the forthcoming guidance from the Supreme Court) certainly confused or misled the .jury, and it left open the possibility that the jury could convict Alvarado upon determining that Thomas’s use of heroin was merely a contributing factor in Thomas’s death. A guilty verdict on this basis would plainly have prejudiced Alvarado;, indeed, the Supreme Court reversed a conviction in Burrage where the jury had relied on this “markedly different understanding of the statute.” See 134 S.Ct. at 892.
C.
Although the Supreme Court indicated that the phrase “results from” imports an actual causation requirement based on its “ordinary meaning,” this meaning was far from clear to the jury in Alvarado’s case. In fact, the jury unmistakably expressed its 'confusion as to the applicable causation requirement, even though the district court had tracked the language of the’Controlled Substances Act in its instructions.
During deliberations, the jury produced a note stating, “We have a question regarding whether ‘death resulted from the use of the heroin’ means solely from the use of heroin, or that heroin ‘contributed to [Thomas’s] death.’” J.A. 747. Once the reconstituted jury began its deliberations anew the following day, the jury repeated its question: “The jury would like clarification on ... [t]he section that says ‘death resulted from the use of the heroin.’ Should this be interpreted as meaning death resulted ‘exclusively’ from the heroin, or that the heroin contributed to the death?” J.A. 922. In response, the district court merely pointed the jury to the original instruction containing the “results from” language, providing no further guidance to alleviate the ambiguity that the jury had highlighted.[2]
The jury in this case was not alone in recognizing that the phrase “results from” *256 is susceptible to multiple meanings. In Burrage, the Solicitor General argued before the Supreme Court that “results from” did not require but-for causation. See 134 S.Ct. at 890 (noting that the government had “urge[d] an interpretation of ‘results from’ under which use of a drug distributed by the defendant need not be a but-for cause of death, nor even independently sufficient to cause death”). .The Supreme Court, however, “deeline[d] to adopt the Government’s permissive interpretation of § 841(b)(1)” and instead held that “[t]he language Congress enacted requires death to ‘result from’ usé of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed.” Id. at 891.
Moreover, other- courts and judges, have disagreed about the meaning of § 841(b)(l)(C)’s text, demonstrating that the meaning of “results from” is not clear without further explanation. Before the Supreme Court granted certiorari 'and reversed in Burrage, the Eighth Circuit had affirmed the defendant’s conviction in that case, holding that the district court had not erred in instructing the jury that “results from” meant that the controlled substance must have been a “contributing cause” of the death. Id. at 886. Moreover, in a separate opinion in Burrage, Justice Ginsburg, joined by Justice Soto-mayo'r, explained that she would apply the rule of lenity, a doctrine invoked only where statutory language is ambiguous, in interpreting § 841(b)(1)(C)’s text. See id. at 892 (Ginsburg, J., concurring in the judgment); cf. Bifulco v. United States, 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980) (recognizing that the rule of lenity “applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose”).
• Thus, even though the Supreme Court has now clarified the meaning of “results from” by interpreting the phrase’s “ordinary meaning,” the language of the Controlled Substances Act, without any further instruction, could certainly have confused or misled the laypersons on the jury—just as it has confused many jurists—to the prejudice of Alvarado. Cf. United States v. MacKay, 20 F.Supp.3d 1287, 1295 (D.Utah 2014) (“In effect the Government asks the Court to find the statutory interpretation skills of the common layperson juror equal to those of Justice Scalia. The Court is unable to make such a finding when this Court, the district court in Burrage, and the Eighth Circuit, all failed to correctly deduce the plain meaning of ‘resulting from.’ ”). In fact, the instructions plainly did confuse the jury in this case, as evidenced by the jury’s questions.[3]
As we must consider the entire jury charge and the record as a whole in assessing whether the jury instructions were adequate and not misleading, see Kivanc, 714 F.3d at 794; Herder, 594 F.3d at 359, I also note that counsel on both sides and testifying witnesses made statements throughout the trial that easily could have led the jury to question the applicable causation requirement. For instance, during direct examination of Dr. Gayle Suzuki, the government asked, “Did the Diphenhy-dramine [i.e., Benadryl] contribute to Eric *257 Thomas’ death?” before clarifying, “So neither the alprazolam [i.e., Xanax] or Diphenhydramine, even though they were there at the same time, contributed to Eric Thomas’ death[?]” J.A. 621. While these questions might be viewed as probing the independent sufficiency of the heroin in causing Thomas’s death, this phrasing could certainly have prompted the jury to believe that the proper inquiry was which drugs did or did not “contribute[ ] to” Thomas’s death.
Likewise, during closing arguments, the government repeatedly emphasized Dr. Suzuki’s testimony that Xanax “played no role in [Thomas’s] cause of death.” J.A. 689. As the government explained, Dr. Suzuki had maintained that “[t]he Xanax and diphenhydramine played absolutely no role in this death. It was the heroin.” Id. Indeed, during cross-examination, -Dr. Suzuki described her determination that, even though Thomas had had Xanax in his system when he died,- the Xanax had not “contributed or helped him to die.” J.A. 630. As above, although the government might have intended to elicit and emphasize these statements to highlight the independent sufficiency of the heroin in causing Thomas’s death, these comments could also have signaled to the jury, even unintentionally, that it must determine which substances may or may not have contributed to, or played a role in, Thomas’s death. And a simple .“but for” instruction could have readily dispelled this possibility; sometimes saying less is not the best course of action. Even though the government also highlighted Dr. Suzuki’s testimony that Thomas would not have died had he not ingested heroin (recalling Dr. Suzuki’s opinion that the heroin was a but-for cause of death), the government’s questions of witnesses and statements during closing arguments did not make clear to the jury that one' standard of causation was more appropriate than another.[4]
While it is not specifically the responsibility of counsel, and certainly not that of an expert witness, to inform the jury of the applicable legal standard, we must consider the whole record, including these statements throughout trial, in assessing whether the district court’s jury instructions were adequate and not misleading. By failing to provide any clarifying instruction on the meaning of “results from” before the jury retired to deliberate or, of even greater significance, in response to the’jury’s subsequent questions highlighting the jury’s manifest struggle with- the statutory requirement of 'causation, the district court did not alleviate any jury confusion that had arisen during the trial, and its limited instructions likely perpetuated this confusion.
D.
It is of no moment that the district court declined to elaborate on the meaning of “results from” in an effort to avoid-the risk of causing further jury confusion. In explaining the rationale behind its decision to adhere to the text of § 841(b)(1)(C) in its instructions, the district court emphasized that it found persuasive the Seventh Circuit’s decision in United States v. Hatfield, 591 F.3d 945 (7th Cir.2010) (Posner, J.). The court in Hatfield had explained that *258 “[elaborating on a term often makes it less rather than more clear” and noted that “[p]robably the same is true of ‘results from.’ ” Id. at 949-50. To be sure, as the.Supreme Court had not yet decided Burrage at the time of Alvarado’s trial, the district court had, little guidance on how best to instruct the jury on the phrase’s meaning, especially since courts were so divided on the issue. Nevertheless, the question before us is whether the instruct tions that the court provided, in light of the entire jury charge and the record as a whole, “adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party.” Kivanc, 714 F.3d at 794 (quoting Noel, 641 F.3d at 586). It is therefore irrelevant that the court might have had difficulty providing more specific instructions.
In light of the Supreme Court’s holding in Burrage that § 841(b)(1)(C) requires a finding that use of the controlled substance was an independently sufficient or but-for cause of death, the district court’s instructions, which -merely directed the jury to determine whether death “resulted from” the use of heroin, were insufficient, no matter how well intended. See Moye, 454 F.3d at 398 (“By definition, a court ‘abuses its discretion when it makes-an error of law.’ ” (quoting Prince-Oyibo, 320 F.3d at 497)). Thus, based on .the record in this case, I would hold that the jury instructions did not “adequately inform[] the jury of the controlling legal principles without misleading or confusing the jury,” Kivanc, 714 F.3d at 794 (quoting Noel, 641 F.3d at 586), and the district court abused its discretion in providing these limited instructions.[5]
II.
The majority concludes that, despite the potential- for error in giving such limited jury instructions-on § 841(b)(l)(C)’s “death results” requirement, no such error occurred in this cáse because the record unequivocally demonstrates that heroin was an independently sufficient or but-for cause of Thomas’s death. In other words, *259 the majority essentially .determines -that the jury instructions in this case could not have misled or confused the jury “to the prejudice of the objecting party.” Id. (quoting Noel, 641 F.3d at 586). As I have already determined that the district court’s instructions were erroneous on the record before us, I explore whether prejudice may have resulted from that error.
A.
When a district court “erroneously instructs the jury on an element of the offense, the error may be disregarded as harmless if a- reviewing court can determine, beyond a reasonable doubt, -that a correctly instructed jury would' have reached the same conclusion.” United States v. Hastings, 134 F.3d 235, 241 (4th Cir.1998). In other words, the relevant inquiry is whether it is “clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.” Neder v. United States, 527 U.S. 1, 15-16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); United States v. Brown, 202 F.3d 691, 699 (4th Cir.2000).
Because the jury instructions in this case allowed the jury to convict Alvarado based on a misinterpretation of an element of the charge—that is, based on a belief' that § 841(b)(l)(C)’s “death results” element[6] merely required that the heroin “contributed to” Thomas’s death—and because the record does not foreclose the possibility that a rational jury might have done so, I would hold that the error wa,s not harmless. Stated differently, I cannot conclude beyond a reasonable doubt that a rational jury given the. correct instructions would have reached the same outcome.
It is important to note that, while the government bears the burden of proving harmlessness, United States v. Lovern, 293 F.3d 695, 701 (4th Cir.2002), the government failed to address this issue at all in its briefing. It contends only that the jury instructions were adequate without suggesting what results if we find , otherwise. Thus, the government, has faded to establish that the district court’s instructional error was harmless beyond a reasonable doubt, and we could -vacate Alvarado’s conviction under § 841(b)(1)(C) on this basis. Nevertheless, I will explore the issue further for the sake of completeness.
B.
Although Dr. Suzuki testified that, in her expert, opinion, heroin intoxication was the cause of Thomas’s death, and she essentially .testified that the heroin was both an independently sufficient and but-for cause of death, other evidence presented at trial could have led a rational jury to conclude that heroin was merely a contributing factor. To begin, the record contained evidence suggesting that heroin was not independently sufficient to have caused Thomas’s death. For instance, Thomas’s fiancée, Monica Shaugnessey, testified that Thomas 'had ingested heroin on a daily basis and had done so for years prior to his death. Ih 2011, Thomas purchased and ingested between five ahd ten bags of heroin each day, and the day he died was no exception. Yet he had only previously suffered cardiac arrest and stopped breathing when he injected a combination *260 of heroin and Xanax, as he did when he died. This history suggests that heroin alone was likely insufficient to have caused Thomas’s death.
It is also significant that the morphine in Thomas’s system from his ingestion of heroin was found to be at a toxic, not lethal, level. J.A. 619. In other words, it was at the level where the substance-may “start doing damage to the body, harming certain systems in the body,” but it had not reached the, level “associated with knowing [the substance] to have caused death.” J.A. 579. Further, Thomas had likely developed a high tolerance for heroin such that he could have ingested much more of the drug before truly reaching a level that was toxic to him. Both doctors who testified at trial stated that they had found the morphine in Thomas’s system to be at a toxic level based on standard charts that do not account for an individual’s particular tolerance for the substance. This evidence supports the conclusion that the heroin in Thomas’s system, while harmful, was not an independently sufficient cause of his death.
The record also does not contain uncon-troverted evidence that heroin was a but-for cause of Thomas’s death. Shaugnessey testified that Alvarado had only recently begun injecting a combination of Xanax and heroin and that doing so prompted severe reactions in Alvarado: “His new thing was to mix them together and that will kill you and he knew this.” J.A. 415. It is unclear, however, that Thomas’s injection of Xanax alone[7] or in combination with Benadryl—even at the relatively low levels that Thomas used these substances-could not have caused his death. Dr. David Burrows, the forensic toxicologist, testified that injecting a substance rather than orally ingesting it causes- the drug to have a faster additive effect. J.A. 596. He also stated that ’mixing Xanax and Benadryl, which are both central nervous system depressants that can affect a person’s breathing and heartbeat, can have “additive to synergistic effects” as the two drugs “compound! ]” and “aggravate” one another. J.A. 589-90. Dr. Suzuki corroborated this testimony, as she confirmed that mixing Xanax and Benadryl together can have an “adverse effect.” J.A. 593.
Finally, the jury was free to assess the credibility of Dr. Suzuki’s testimony and disregard it if the jury found it unreliable. Indeed, the jury was specifically instructed on this point: “Expert testimony should be considered just like any other testimony. You may accept or reject it, and give it as much weight as you think it deserves.... The same as with any other witness, it is up to you to decide whether to rely upon it.” J.A. 935. Accordingly, simply because Dr. Suzuki’s testimony suggested that heroin was an independently sufficient and but-for cause of Thomas’s death did not preclude the jury from concluding otherwise and convicting on an alternative basis. Thus, I cannot conclude beyond a reasonable doubt that a rational jury would have reached the same outcome had it received a proper instruction. Rather, a rational jury could certainly have concluded, based on the record, that the use of heroin was neither an independently sufficient cause nor a but-for cause of Thomas’s death and improperly triggered § 841(b)(l)(C)’s penalty enhancement upon finding that heroin merely “contributed to” Thomas’s death.
*261 In determining otherwise, the majority indicates that “[t]here was no evidence in the record that Thomas could have died without the heroin” and that “no party suggested that, even without the heroin, Thomas would have died.” Ante at 244, 249. These considerations appear to impermissibly shift the burdens of proof and persuasion to Alvarado, the criminal defendant. See Sullivan v. Louisiana, 508 U.S. 275, 377-78, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (“The prosecution bears the burden of proving all elements of the offense charged and must persuade the fact-finder ‘beyond a reasonable doubt’ of the facts necessary to establish each of those elements.” (emphasis added) (citations omitted)); see also In re Winship, 397 U.S. 358, 359-64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (discussing the “vital” and “indispensable” nature of the government’s burden to prove guilt of a criminal charge beyond a reasonable doubt).
Alvarado had no duty to present evidence that the heroin he was charged with distributing merely contributed to Thomas’s death; nor did he have any responsibility to argue that Thomas would have died absent the heroin. Rather, the government bore the burden' of proving beyond a reasonable doubt that the heroin Alvarado distributed was an independently sufficient or but-for cause of Thomas’s death. The only evidence that the government presented on this matter was Dr. Suzuki’s testimony, to which the jury was free to assign little weight or reject entirely based on its determination of Dr. Suzuki’s credibility. Further, even though Alvarado had no duty to present evidence, the record did in fact contain evidence, including Shaugnessey’s and Dr. Burrows’s testimony, that could well have led a rational juror to conclude that the heroin was neither an independently sufficient cause nor a but-for cause of Thomas’s death. Accordingly, I would hold that the erroneous instruction was not harmless beyond a reasonable doubt.
And there is one additional consideration in this case worthy of notice that bolsters the claim of prejudice. The indictment in this case contained but one count, that alleging a violation of § 841(b)(1)(C), the death count. The indictment contained no separate count for mere distribution of heroin. Thus, given the manner in which the government elected to charge and present the case, the jury was faced with a choice of either acquitting an avowed drug trafficker or throwing up its hands and convicting after its repeated requests of the court for clarification of the causation requirement were rebuffed. Cf. supra n. 3. In the face of the court’s serial refusals to provide the help the jury was desperately seeking, few laypersons would be willing to say “not proven” and return a verdict in favor of the drug dealer.
III.
For the foregoing -reasons, I would vacate the judgment of conviction under § 841(b)(1)(C) and remand with instructions. that Alvarado either (1) be accorded a new trial or (2) be resentenced without a new trial on the lesser included §. 841(a)(1) distribution offense. Cf. United States v. Hickman, 626 F.3d 756, 760 (4th Cir.2010); see also United States v. Blue, 808 F.3d 226, 237 (4th Cir.2015) (recognizing that “it is within . our power to direct entry of judgment on a lesser included offense when vacating a greater offense” if the commission of the lesser offense “can be established from facts that the jury actually found” (citations omitted)); United States v. Ford, 750 F.3d 952 (8th Cir.2014) (finding insufficient evidence of causation and remanding for resentencing on lesser included drug offense). I agree with the *262 majority’s determination-.that no other error infected the proceedings in this case.

. Even though Alvarado did not object to the district court’s response to these inquiries, I nonetheless consider the jury’s questions and the district court’s response in assessing the adequacy of the instructions, as our precedent requires us to consider the instructions in light of the entire jury charge and the whole record. See Kivanc, 714 F.3d at 794; Herder, 594 F.3d at 359.

'. Although .the reconstituted jury reached its decision fairly quickly after the court addressed (or, more accurately, declined to address) its last .question, the jury's questions nonetheless illustrated its confusion regarding the “results from” requirement. Further, while the jury's efficiency in reaching a ver-diet might indicate that the jury promptly concluded that the statutory language required a finding of independent sufficiency or but-for causation, it could just as easily demonstrate that the jury quickly concluded that "results from” required only contributory causation.

. The government was not alone in making statements that likely confused the jury as to the proper standard for determining whether heroin actually caused Thomas’s death. In her closing arguments, defense counsel stated that the jury would need to "determine whether the death resulted from heroin, whether the death resulted from Xanax, [or] whether it resulted from the combination of the different drugs,” without clarifying whether a guilty verdict would be more or less appropriate on any one of these bases. J.A. 718.

. By the same logic, I would hold that the district court’s decision to limit its instruction on causation to the "results from” language of the statute wás also plain error were it necessary to apply that standard of review. To sátisfy the plain error standard, a defendant must show that "(1) an error was made; .(2) the error is plain; and (3) the error affects substantial rights.” United States v. Massenburg, 564 F.3d 337, 342-43 (4th Cir.2009) (citing United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)), The third prong typically "means that the error must have been prejudicial; It must have affected the outcome of the district court proceedings.” Olano, 507 U.S. at 734, 113 S.Ct. 1770.
Before the judgment against Alvarado became final, the Supreme Court held in Bur-rage that it is reversible error for a district court to instruct a jury in a manner that allows the jury to find that “death resulted” under § 841(b)(1)(C) based on a determination that the substance the defendant distributed merely contributed to the death. As the jury instructions in this case did not foreclose the possibility that the jury would convict upon finding contributory causation, the instructions were erroneous, and the error in this case was plain-at the time of appellate review. See Henderson v. United States, — U.S. —, 133 S.Ct. 1121, 1124-25, 185 L.Ed.2d 85 (2013) ("[A]s long as the error was plain as of ... the timé of appellate review ... the error is ‘plain’ within the meaning of [Federal Rule of Criminal Procedure 52(b)],”). Further, as demonstrated throughout this opinion, Alvarado has shown that the error was prejudicial, as it likely influenced the jury’s determination that "death resulted” from the heroin that Alvarado distributed, affecting the outcome of the trial. See Olano, 507 U.S. at 734-35, 113 S.Ct. 1770 (recognizing that the defendant bears the burden of establishing that plain error was prejudicial). Thus, the district court committed plain error in providing these jury instructions.

. Burrage made clear that, “[b]ecause the death results’ enhancement increased the minimum and maximum sentences to which [the defendant] was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt.” 134 S.Ct. at 887 (citing Alleyne v. United States, — U.S. —, 133 S.Ct. 2151, 2162-63, 186 L.Ed.2d 314 (2013); Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)).

. While Dr.. Suzuki did indicate that, in her . expert opinion, the relatively low level of Xa-nax in Thomas’s system would have been insufficient to have independently caused his death, she did not speak to the effect that Thomas’s intravenous injection of the substance may have had.