In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2481

JENNIFER LYNN KRIEGER,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:14-cv-00749-JPG — **J. Phil Gilbert**, *Judge.*

ARGUED MAY 24, 2016 — DECIDED NOVEMBER 22, 2016

Before ROVNER, SYKES, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* The first time this appeal was before
us, on direct review, Jennifer Krieger was seeking to vacate
the twenty-year sentence she received when her friend died
after chewing a fentanyl pain patch provided by Krieger. At
that time, she objected to the manner in which the govern-
ment proved that "death resulted" from the distribution of
the drugs—as a sentencing factor by a preponderance of the

evidence, rather than as an element proved beyond a reasonable doubt—and also argued that the evidence was insufficient to support a finding that the victim's death had occurred because of the fentanyl. Given the statutory sentencing structure in place at the time, and the fact that the district court found, by a preponderance of the evidence, that death had resulted from the distribution, there was only one sentence that the district court could give, and that was twenty years. The district court expressed discomfort with its lack of discretion and the fact that it appeared that Krieger was being sentenced for homicide despite having been convicted only of distributing fentanyl—concerns that this court echoed on appeal. Nevertheless, based on then current law, we found no error and affirmed the decision of the district court. After Krieger's sentencing and after her direct appeal, the Supreme Court issued two decisions that touch on the very issues raised at Krieger's sentencing. Consequently, on June 30, 2014, Krieger filed a petition under 28 U.S.C. § 2255 asking the court to vacate, set aside, and correct her sentence based on new Supreme Court rules that she argues should be applied retroactively on collateral review.

The facts below are both abridged and supplemented from the decision we issued on December 7, 2010, during Krieger's first (direct) appeal as reported in *United States v. Krieger*, 628 F.3d 857, 869 (7th Cir. 2010).

The afternoon before Thanksgiving, 2005, Jennifer Curry's mother found her nineteen-year-old daughter dead on a sofa at the home of Curry's father. At the scene, investigators found, among other things, a chewed 100 microgram Duragesic patch. Duragesic is a brand name for a fentanyl skin patch, a powerful opioid that is delivered across the skin in

small steady doses over the course of several days to control pain. It is not meant to be ingested orally nor injected under the skin, but sometimes is by those who are abusing the drug. Of course, fentanyl is available only by prescription and, not surprisingly, Jennifer Curry did not have one. Her friend, Jennifer Krieger, however, had such a prescription and despite her pain from severe spinal cord and disk problems, she began selling the patches to others for $50 apiece or, as happened here, giving them to her friends. On November 22, 2005, Krieger filled her prescription for the patches and later that afternoon gave one to Curry. Krieger left Curry at around midnight and another witness saw Curry leave a bar with two men in the early hours of November 23. Curry arrived at her father's home at approximately two o'clock in the morning. Her mother found her unresponsive at approximately four o'clock the next afternoon and arriving paramedics determined that Curry had been dead for some time. At the scene, the investigators found a hypodermic needle, a small pipe with burnt residue on it, and two red capsules. Neither the two red capsules nor the pipe were taken into evidence and tested. The syringe was not tested until three years later, at the request of the U.S. Attorney's office. A medical examiner found traces of many drugs in Curry's system, including cocaine, benzodiazepines, cannabinoids, and Oxycodone, but concluded that Curry died from fentanyl toxicity.

A federal grand jury returned a two-count indictment on January 5, 2006, charging Krieger with distribution of divers amounts of fentanyl with death resulting, under 21 U.S.C. § 841(a)(1) and § 841(b)(1)(c). Krieger conceded that she gave Curry a patch. She denied, however, that the government proved sufficiently that Curry's death resulted from her abuse of the fentanyl patch.

The government, it seems, also quickly realized that its case for "death resulting" faced some heavy obstacles. In a strange twist of events, the government's main witness, the medical examiner, Dr. John Heidingsfelder, fled the country under a cloud of suspicion. It seems that Heidingsfelder had legal problems of his own, including tax and ethics trouble, and had left the country and set up a practice in the Cayman Islands. Investigators for the United States Attorney's office had been unable to track him down. Heidingsfelder also had been disciplined by the Indiana Medical Licensing Board for engaging in a prohibited personal relationship with a patient, for prescribing medication to his girlfriend/patient, and failing to keep abreast of current professional theory and practice. Apparently, Heidingsfelder had engaged in sexual contact with a patient under his care and provided her hydrocodone and other narcotic drugs. The woman committed suicide after Heidingsfelder terminated the relationship.

With the main witness unavailable, the government informed the court that it was engaged in good faith plea negotiations. When those negotiations failed, the government returned a one-count superseding indictment in which the "with death resulting" language of the indictment had been eliminated. In this superseding indictment, Krieger was charged only with distribution of divers amounts of fentanyl in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C). The following day, Krieger filed a motion to dismiss the indictment arguing that the unavailability of the doctor who performed the autopsy presented an incurable confrontation clause and chain-of-custody problem. The district court denied the motion but left open the possibility that it would revisit the issue at a later time. On October 18, 2008, Krieger pleaded guilty to

the superseding indictment with the specific exclusion that she was not pleading guilty to causing the death of Curry.

Although the government dropped the "with death resulting" charge from the indictment, which would require the government to prove those facts beyond a reasonable doubt, the government nevertheless sought to have Krieger sentenced under a statute that enhances the sentence if the government can prove, by a preponderance of evidence, that death resulted from the drug's use. 21 U.S.C. § 841(b)(1)(C). That statute instructs, "[I]f death or serious bodily injury results from the use of such substance [such person] shall be sentenced to a term of imprisonment of not less than twenty years or more than life." *Id.* Enhancing the sentence in this way leads to a significant change in the sentence. Krieger's pre-sentencing report set forth a recommended sentencing range of ten to sixteen months. If the government could prove by the much more lax preponderance of the evidence standard that Curry's death resulted from Krieger's distribution of fentanyl, those facts would trigger a mandatory minimum sentence of twenty years under 21 U.S.C. § 841(b)(1)(C).

The court held a sentencing hearing on November 18 and 19, 2008, to determine whether the fentanyl had resulted in the death of the victim. During that hearing, the government called numerous witnesses, including the previously unavailable but subsequently found Heidingsfelder. Krieger called Dr. Long, a forensic toxicologist who testified regarding problems with evidence collection and who challenged the determination of the cause of death.

The "death resulting" evidence was muddled and slim. Krieger presented evidence that the investigators and doctor performing the autopsy focused exclusively or primarily on

the fentanyl evidence while ignoring evidence related to the many other drugs in Curry's system, in particular evidence of cocaine use. And of course, the misdeeds of the tax cheat, scofflaw medical examiner hung heavily in the air of the hearing. Nevertheless, after evaluating Dr. Heidingsfelder's demeanor on the stand and his evidentiary presentation, the district court concluded that although his testimony about his personal life was not credible, his testimony as to how he conducted the autopsy and how he arrived at his conclusion as to the cause of Curry's death was indeed credible. On appeal we accepted this factual finding regarding demeanor and credibility, noting that it could not be overturned unless we found that Heidingsfelder was incredible as a matter of law, which we could not. *Krieger*, 628 F.3d at 869.

Heidingsfelder testified that he collected blood and vitreous fluid samples from Curry and sent them to a private and reputable laboratory in Indianapolis. That lab reported fentanyl in Curry's blood in the toxic to lethal range. Heidingsfelder found no external traumatic injuries and noted physical findings consistent with a drug overdose. Although Heidingsfelder noted needle marks on Curry's left elbow, and the lab report indicated the presence of several other drugs in Curry's system, Heidingsfelder testified that in his opinion, based on the facts known about her death, his examination of her body, and the lab report, Curry's death was caused by fentanyl toxicity, and not by the other drugs found in her system either taken alone or in combination. The government, likely because it recognized the problems with its main witness, Dr. Heidingsfelder, called three other experts: Dr. Mark LeVaugh, a physician specializing in forensic pathology, Dr. Michael Evans, a forensic toxicologist, and Dr. Cynthia Morris–Kukoski, a forensic toxicologist employed by the FBI lab.

All bolstered Heidingsfelder's finding of a toxic-to-lethal level of fentanyl. Krieger, in turn, called Dr. Long, a forensic toxicologist. Long criticized Heidingsfelder for failing to test the needle marks on Curry's body, for his choice of location to draw blood, and for recording an incorrect time of death, among other things. He also questioned whether blood samples had been mishandled or placed in vials with the incorrect preservative. He maintained that the reports from the lab used by Heidingsfelder and the FBI laboratory reports were either incomplete or inconsistent with each other. Finally, he testified that the blood was not tested immediately and therefore would not accurately indicate the use of cocaine. As he testified, "you can have somebody who overdoses on cocaine, and if the blood sample isn't taken relatively close and preserved properly, all the cocaine breaks down to benzoylecgonine and becomes an un-interpretable result." Petitioner's Sep. App. at 33 (R. 165, p.19, Page ID 715). He questioned whether the failure to investigate and follow up on other possible causes of death resulted in an incorrect determination of the cause of death. Nevertheless, he admitted that the lab reports showed the presence of fentanyl in Curry's system in amounts that were four times the therapeutic range and thus potentially lethal. According to Dr. Evans, a toxicologist who testified, the therapeutic range for fentanyl when used in such a patch is 1-3 nanograms per mil. Jennifer Curry's was more than 13 nanograms per mil. (R. 164, p. 178, page ID 636). Deaths from fentanyl occur at amounts from 2.2 to 100 nanograms per mil. *Id.*

The police chief in charge of the investigation admitted to inadequate police work in some areas. Officers failed to collect into evidence and send for testing two red capsules in Curry's bedroom. The syringe was not tested until three years

after Curry's death, but then was found to contain trace amounts of cocaine. The only items sent to the lab by the police department for testing were those pertaining to fentanyl.

On January 16, 2009, the district court issued its order, finding, by a preponderance of the evidence, that the fentanyl supplied by Krieger resulted in the death of Curry. In view of the conflicting evidence as to the cause of Curry's death, the court concluded emphatically that the government would not have been able to prove, beyond a reasonable doubt, that Krieger's distribution of fentanyl was the cause of Curry's death, had Krieger been charged with that offense. The court was persuaded, however, that a preponderance of the evidence established fentanyl as the cause of Curry's death, and concluded that "the Government has established that it is more probable than not that Ms. Krieger's distribution of fentanyl to Ms. Curry resulted in Ms. Curry's death." *United States v. Krieger*, No. 06-CR-40001-JPG, 2009 WL 112428, at *4 (S.D. Ill. Jan. 16, 2009), *aff'd*, 628 F.3d 857 (7th Cir. 2010).

Once the court made the finding, by a preponderance of the evidence, that death resulted from the fentanyl, it concluded that it was obligated to impose the mandatory statutory minimum under § 841(b)(1)(C) "if death results"—twenty years. Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the court could not impose a sentence greater than the twenty-year statutory limit for distribution of the drug—the crime to which Krieger pleaded guilty. But, given the twenty year minimum triggered by the court's finding, by a preponderance of the evidence, that Curry's death resulted from the distribution of fentanyl, neither could the court impose a sentence of less than twenty years. Without death resulting, the pre-sentence report reflected an advisory Guideline range of

10-16 months. And, in fact, our previous research indicated that the average length of incarceration for fiscal years 2006-2009 under 21 U.S.C. § 841 for distribution of fentanyl without death resulting was seven months. *Krieger*, 628 F.3d at 866. In short, in this case the mandatory minimum triggered by facts found by the court based on a preponderance of the evidence in sentencing converged with the statutory maximum imposed for facts to which Krieger pleaded guilty as an element of the crime. The result was that the court could impose exactly one sentence—twenty years. The judge had no discretion whatsoever in the choice of sentence.

The district court at sentencing was uncomfortable, it seems, with the fact that "Krieger, while convicted of distribution of divers amounts of narcotics, is being sentenced for homicide." *Krieger*, 2009 WL 112428, at *6. The court went on at some length criticizing the sentencing scheme, and declared that "had the Court the discretion to insist that the Government prove beyond a reasonable doubt that the distribution to which Krieger pleaded guilty resulted in Curry's death before imposing the statutory minimum sentence, it would have exercised that discretion in this case." *Id.* The district court made it clear that it was sentencing Krieger to twenty years as it felt that it had no choice, but specifically noted

> had the Court the discretion to sentence Krieger within the entire statutory range for the crime to which she pled guilty, it would have applied the adjusted base offense level called for in U.S.S.G. § 2D1.1(a)(2), finding that the Government has established the "death resulting" factor by a preponderance of the evidence. As a result, Krieger's base offense level would have been 38.

> The Court would have given her three points off for acceptance of responsibility. As a result the Court would have found a net offense level of 35, criminal history category I, with an advisory guideline range of 168 to 210 months.

*Id.* at *8.

At the time of Krieger's first appeal, only facts that increased the penalty of the crime beyond the mandatory statutory maximum had to be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. Because the "death resulting" factor only increased the mandatory minimum, under existing law at the time, it did not have to be pleaded in the indictment and proved to a jury beyond a reasonable doubt, but rather could be found by a judge using a preponderance of the evidence standard just as the district court did below. *Krieger*, 628 F.3d at 867, 869; *Harris v. United States*, 536 U.S. 545, 557 (2002), *overruled by Alleyne v. United States*, 133 S. Ct. 2151 (2013). The district court stated, "the only reason the Court would have to consider "death resulting" to be an element of a separate crime rather than a sentencing factor is if it ran afoul of *Apprendi*." *Krieger*, 2009 WL 112428, at * 5. But the court noted, correctly at the time, that it did not.

All of that changed, however, in 2013, when the Supreme Court issued its decision in *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013). In *Alleyne*, the Supreme Court held that facts that increase a mandatory minimum sentence (just like those that increase the mandatory maximum sentence) must be submitted to the jury and proved beyond a reasonable doubt. *Id.* If *Alleyne* were the law of the land at the time that Krieger was sentenced, therefore, the fact of "death resulting" would have

had to be submitted to a jury and proved beyond a reasonable doubt. We know it likely would not have been because the district court said in no uncertain terms "had the Court applied the reasonable doubt standard, the Government would not have met its burden of proof in establishing that Ms. Krieger's distribution of fentanyl to Ms. Curry resulted in the latter's death." *Krieger*, 2009 WL 122428, at *4. In short, were Krieger to be sentenced today she could not be sentenced for Curry's death unless the indictment had charged and a jury had found, beyond a reasonable doubt, that the fentanyl caused Curry's death, a finding the district court did not think possible. Without the mandatory minimum, therefore, Krieger's sentence would have been significantly shorter. In this case, the district court specifically forecast what his sentence would have been without the mandatory minimum— somewhere within the advisory guideline range of 168 to 210 months. *Id.* at *8.

The *Alleyne* decision, however, by itself, cannot help Krieger because this circuit has held that the rule announced in *Alleyne* is procedural and therefore cannot be applied retroactively on a collateral review, such as this one. *Crayton v. United States*, 799 F.3d 623, 624 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 424 (2015). *But see id.* at 632-33 (Williams, J., *concurring*) (a procedural rule that requires that criminal defendants must be convicted beyond a reasonable doubt is essential to ordered liberty and therefore should be applied retroactively). For that reason, this court vacated the portion of its certificate of appealability that allowed for claims under *Alleyne*, noting that it does not apply retroactively on collateral review. (Ct. App. R. 7).

*Alleyne*, however, was not the only relevant case the Supreme Court has issued since Krieger was sentenced. In 2014, the Supreme Court held that a defendant cannot be liable under the penalty enhancement provision for distribution of a drug with "death resulting"—the very same provision under which Krieger's sentence was enhanced (28 U.S.C. 841(b)(1)(C))—unless such use of the drug was a but-for cause of death. *Burrage v. United States*, 134 S. Ct. 881, 892 (2014).

A new rule announced by the Supreme Court applies to all cases still pending on direct review, but for cases such as this one, on collateral review where a final judgment has been issued, the rule applies only in certain circumstances. *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004). One such circumstance is when the new rule is substantive. *Welch v. United States*, 136 S. Ct. 1257, 1264 (citing *Schriro,* 542 U.S. at 351). Rules that "narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish" are substantive and thus apply retroactively. *Schriro*, 542 U.S. at 351–52 (internal citations omitted). "Such rules apply retroactively because they necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." *Id.* at 352 (internal quotations omitted). In other words, "a rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes." *Id.* at 353.

Krieger argues that *Burrage* narrowed the scope of a criminal statute at issue, § 841(b)(1)(C) and placed certain conduct "beyond the power of criminal law-making authority to prescribe" and thus is a substantive rule. The government agrees,

conceding that *Burrage* is substantive because it defines an essential element of a federal crime in a way that creates the risk that individuals convicted before the *Burrage* decision were improperly convicted of that offense—or in this case, improperly subjected to the sentence mandated for that offense. Just recently we accepted this same concession by the government, that is that *Burrage* narrowed the scope of the "death results" enhancement and is thus substantive and applies retroactively. *Gaylord v. United States*, 829 F.3d 500, 505 (7th Cir. 2016). The government has made this same concession before several other courts which have likewise accepted the concession. *See Ragland v. United States*, 784 F.3d 1213, 1214 (8th Cir. 2015) ("the government conceded … *Burrage* applies retroactively"); *see also, Weldon v. United States*, No. 14-0691-DRH, 2015 WL 1806253, at *3 (S.D. Ill. Apr. 17, 2015) (the government conceded that *Burrage* is substantive in nature and is retroactive, but argued that it was inconsequential for other reasons), *vacated on other grounds*, No. 15-1994, 2016 WL 4468077 (7th Cir. Aug. 24, 2016); *United States v. Schneider*, 112 F. Supp. 3d 1197, 1207 (D. Kan. 2015) ("The government concedes, and the court agrees, that *Burrage* announces a new substantive rule of law applicable to cases on initial collateral review."), *aff'd*, No. 15-3247, 2016 WL 6543342 (10th Cir. Nov. 4, 2016); *United States v. Snider*, No. 3:07-CR-124-SI, 2016 WL 1453878, at *10 (D. Or. Apr. 13, 2016) (accepting government's concession that *Burrage* standard applies).[1]

---

[1] It is also true that a number of district courts have issued opinions holding that *Burrage* does not apply retroactively, although none with any significant analysis. *Stewart v. United States*, 89 F. Supp. 3d 993, 996 (E.D. Wis. 2015) (finding *Burrage* not retroactive merely by citing other cases finding same); *Alvarez v. Hastings*, No. CV214-070, 2014 WL 5364189, at *1 (S.D.

The Supreme Court has not yet declared whether *Burrage* should be applied retroactively, but "[d]istrict and appellate courts, no less than the Supreme Court, may issue opinions" on initial petitions for collateral review holding in the first instance that a new rule is retroactive in the absence of a specific finding to that effect by the Supreme Court. *Ashley v. United States*, 266 F.3d 671, 673 (7th Cir. 2001); *see also Butterworth v. United States*, 775 F.3d 459, 465 (1st Cir.), *cert. denied*, 135 S. Ct. 1517 (2015) (noting appellate court's authority to decide if *Alleyne* should be applied retroactively); *United States v. Swinton*, 333 F.3d 481, 486 (3d Cir. 2003) ("courts of appeals and district courts may determine whether a novel decision of the Supreme Court applies retroactively." Our reasoning in *Ashley* was as follows:

---

Ga. Oct. 21, 2014) (adopting magistrate judge's report and recommendation found at 2014 WL 4385703 at *1, explaining that petitioner was not allowed to file second or successive § 2255 motion because the Supreme Court "did not expressly hold that *Burrage* is retroactive on collateral review."), *appeal dismissed* (July 13, 2015); *United States v. Bourlier*, No. 3:14cv609, 2014 WL 6750674, at *2 (N.D. Fla. December 1, 2014) (stating that the Supreme Court has not expressly held that its holding in *Burrage* is retroactively applicable to cases on collateral review); *De La Cruz v. Quintana*, No. 14–28–KKC, 2014 WL 1883707, at *6 (E.D. Ky. May 1, 2014) ("The Court in *Burrage* did not indicate whether *Burrage* applies retroactively, and to date, the Court is unaware of any authority that would make it retroactive" but deeming it unnecessary to decide); *Taylor v. Cross*, No. 14–CV–304-DRH, 2014 WL 1256371, at *3 (S.D.Ill. Mar. 26, 2014); *Powell v. United States*, No. 3:09–CV–2141, 2014 WL 5092762, at *2 (D. Conn. Oct. 10, 2014) (finding that *Burrage* does not apply retroactively because it is only about the procedural issues of who decides a given question and under what standard); *United States v. Grady*, No. 5:10CR0002, 2015 WL 4773236, at *4, (W.D. Va. Aug. 12, 2015) (finding *Burrage* is not retroactive "because the Supreme Court has not declared it to be retroactively applicable, and no other court has such authority.")

> An *initial* petition may be filed within a year of
> a decision that is "made retroactively applicable
> to cases on collateral review[.]" A *second* peti-
> tion, by contrast, depends on "a new rule of con-
> stitutional law, made retroactive to cases on col-
> lateral review *by the Supreme Court*" (emphasis
> added). Both statutes make it clear that only the
> Supreme Court may issue the new decision. But
> who decides whether that new decision applies
> retroactively? The first formulation ("made ret-
> roactive") leaves that question open. The sec-
> ond formulation ("made retroactive … by the
> Supreme Court") answers it. To treat the first
> formulation as identical to the second is not
> faithful to the difference in language. By omit-
> ting the restriction contained in ¶ 8(2), ¶ 6(3) im-
> plies that courts of appeals and district courts
> may "make" the retroactivity decision. *Tyler*
> concludes that the word "made" in ¶ 8(2) means
> "held." 533 U.S. at ——, 121 S.Ct. at 2483. Dis-
> trict and appellate courts, no less than the Su-
> preme Court, may issue opinions "holding"
> that a decision applies retroactively to cases on
> collateral review. The jurisdictional (and prece-
> dential) scope of that holding differs, but it is a
> holding nonetheless.

*Ashley*, 266 F.3d at 673 (emphasis in original).

Of course we are not bound to accept the government's
concession when the point at issue is a question of law. *Cos-
tello v. BeavEx, Inc.*, 810 F.3d 1045, 1061 n.4 (7th Cir. 2016). Nev-
ertheless, that concession seems apt. In *Burrage*, the defendant

was found guilty of distribution of heroin with death result-
ing from the use of that heroin. *Burrage*, 134 S. Ct. at 886. The
victim in that case had been on a drug bender and had multi-
ple drugs from various sources in his body at the time of
death. Burrage's lawyer argued that the jury had to find that
the victim would not have died but for the use of the heroin
distributed by Burrage. The court ultimately accepted the
government's jury instruction which required only that the
jury find that the heroin was a contributing cause. The jury
convicted, and the appellate court affirmed his conviction *Id.*
The Supreme Court, however, reversed, holding that, "at least
where use of the drug distributed by the defendant is not an
independently sufficient cause of the victim's death or serious
bodily injury, a defendant cannot be liable under the penalty
enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such
use is a but-for cause of the death or injury." *Burrage*, 134 S.
Ct. at 892. This holding was critical in *Burrage*, as no expert
was willing to say that the victim would have died from the
heroin use alone, but it was clear that the heroin certainly con-
tributed to an overall effect that caused the victim to stop
breathing and die. *Id.* at 885, 890.

The lower courts that have concluded that *Burrage* cannot
be applied retroactively have largely relied on the fact that the
Supreme Court has not so held. *See* footnote 1, *supra*. But as
we explained extensively above, "[d]istrict and appellate
courts, no less than the Supreme Court, may issue opinions"
on initial petitions for collateral review holding in the first in-
stance that a new rule is retroactive in the absence of a specific
finding to that effect by the Supreme Court. *Ashley*, 266 F.3d
at 673. And to the extent that some of those courts thought
that *Burrage* was just an extension of the procedural rule in
*Alleyne*, they were simply incorrect. For example, one district

court concluded that *Burrage* did not apply retroactively as it was "only about procedure—i.e., who decides a given question, judge versus jury, and under what standard, preponderance versus reasonable doubt." *Powell v. United States*, No. 3:09–CV–2141, 2014 WL 5092762, at *2 (D. Conn. Oct. 10, 2014).

But this misunderstands the holding of *Burrage*. *Burrage* did reference *Alleyne* to establish that "[b]ecause the 'death results' enhancement increased the minimum and maximum sentences to which Burrage was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt." *Burrage*, 134 S. Ct. at 887. This was a foundational issue in *Burrage*, however, and not its holding. The *Burrage* holding is not about who decides a given question (judge or jury) or what the burden of proof is (preponderance versus proof beyond a reasonable doubt). It is rather about *what* must be proved. The holding of *Burrage* could not be more clear, for the Supreme Court set forth its holding, by stating, "We hold that, at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." *Id.* at 892. In other words, the rule announced in *Burrage* altered the range of conduct that the law punishes. *Schriro*, 542 U.S. at 353.

A hypothetical will help explain why this is so. Suppose a former law made it a crime to drive while impaired by alcohol, a term that was defined to mean that the accused has had any amount of alcohol in the previous twenty-four hours—

even one sip. To enforce this law, the police used a breatha-lyzer that merely indicated the presence or absence of alcohol. Anyone whose breath registered the presence of alcohol was guilty of violating the law. Now suppose that the Supreme Court found that law to be impermissibly overbroad, and in response, jurisdictions narrowed the scope of their laws to state that a driver could not be considered to be impaired un-less her blood alcohol level registered at .08% or greater—a threshold commonly thought to signal that the driver is im-paired. This change is a substantive rule change as it alters the range of conduct that it punishes and, as to defendants con-victed under the former rule, it carries "a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot im-pose upon him." *Schriro* at 352. A defendant convicted under the previous law for driving while impaired might have just a .02% blood alcohol level—an act that the law does not make criminal.

Just as in this hypothetical, the *Burrage* decision narrowed the scope of the behavior subject to punishment for "death re-sulting" by requiring that the drug at issue was the but-for cause of the victim's death rather than merely a contributing cause of death. *See Burrage,* 134 S. Ct. at 893. As Krieger argues and the government concedes, the case law supports a finding that *Burrage* applied a new substantive rule that must be ap-plied on collateral review.

Thus even if we set *Alleyne* aside for purposes of this col-lateral review, as we must (for it cannot be applied retroac-tively), in order to find that death resulted for purposes of the statutory minimum, the fentanyl would have to be shown to be the but-for cause of Jennifer Curry's death.

Although the government concedes that *Burrage* applies retroactively, it nevertheless argues that the district court did indeed find that the fentanyl was the but-for cause of Curry's death. We are not so certain. The application of the *Burrage* holding to a pre-*Burrage* case presents two problems for an appellate court trying to determine whether the government proved that Curry would have died "but for" the fentanyl that Krieger gave to her.

First, before *Burrage*, the district court had no reason to know that "but-for" causation was the requirement. Nor did the police, the prosecutor, the medical examiner or the defendant herself. In our example above, in a world where any amount of alcohol in the system is illegal, there would be no reason for a court to make a factual determination that a defendant had .08% blood alcohol level. A court that has found that a defendant is "impaired" may have had before it a defendant with .03% blood alcohol level or .15%. And by applying the new rule in this situation, where the evidence was not examined to answer the proper question, the defendant faces a significant risk that she stands convicted of "an act that the law does not make criminal or faces a punishment that the law cannot impose upon h[er]." *Schriro*, 542 U.S. at 352.

More importantly, given the district court's language, we cannot say with any certainty that the district court made a finding that but for the fentanyl that Krieger supplied, Jennifer Curry would not have died. In fact, the district court did not use the term "but for" anywhere in the order. The order is awash in confusion about what causation means in this context. This is not due to any fault on the part of the district court judge, who did a thorough job on a difficult case, but rather it is due to the lack of clarity about what type of causation the

government would have to prove to demonstrate that the death of a particular victim resulted from a drug that had been supplied by the defendant. Before *Burrage*, no district court had any reason to know that it should be focusing on "but-for" causation when sentencing for "death resulting." A perfect example of the murkiness of causation in this context can be seen in the following paragraph from the district court's order at sentencing:

> the statute imposes the minimum sentence of twenty years **not when the defendant "causes" the death at issue, but when the death "results" from the distribution**. Dr. Christopher Long testified at the sentencing hearing that the high levels of fentanyl found in Curry's system were not necessarily indicative of the cause of death. He said:
>
>> For example, we may have a very high concentration of a particular drug, a fatal level. And then we say, "Well, he was hit by a train." Well, of course, you know what killed him. It wasn't the drug. It was the train.
>
> However, **for purposes of this statutory mandatory minimum, the Government need not prove that Krieger 'caused' Curry's death, only that Curry's death 'resulted' from Krieger's action.** Therefore, if the victim in Dr. Long's hypo-

> thetical had fallen asleep on the train track be-
> cause of the fentanyl, we would say the train
> "caused" her death, but her death "resulted"
> from the fentanyl.

*Krieger*, 2009 WL 112428, at *6–7 (emphasis ours). In fact, the district court goes so far as to say that "[t]he statute imposes on the Government no need to show that the defendant had any degree of mens rea. It imposes no requirement of foresee-ability. **It imposes no requirement of causation**." *Id.* at *7 (emphasis ours).

If, in fact, the court was applying a standard in which the government "need not prove that Krieger 'caused' Curry's death, only that Curry's death 'resulted' from Krieger's ac-tion" (as it appears in the quoted language above), then it was not applying but-for causation as defined in *Burrage*. Moreo-ver, the court used this "death resulting" language through-out its opinion (all emphases ours):

• "Having weighed all of the evidence presented, the Court finds that the Government has established that it is more probable than not that Ms. Krieger's distribution of fen-tanyl to Ms. Curry *resulted in* Ms. Curry's death." *Krieger*, 2009 WL 112428, at *4.

• "However, had the Court applied the reasonable doubt standard, the Government would not have met its bur-den of proof in establishing that Ms. Krieger's distribution of fentanyl to Ms. Curry *resulted in* the latter's death." *Id.*

• "Therefore, the Court, upon a finding that the drug dis-tributed by Krieger *resulted in* the death of Jennifer Curry, is mandated by Congress to sentence Krieger to the statutory minimum of twenty years." *Id.* at *5.

• "But, had the Court the discretion to insist that the Government prove beyond a reasonable doubt that the distribution to which Krieger pled guilty *resulted in* Curry's death before imposing the statutory mandatory minimum sentence, it would have exercised such discretion in this case." *Id.* at *6.

• "Therefore, the Court, having found that the Government has proved by a preponderance of the evidence that the distribution of fentanyl to which Krieger pled guilty *resulted in* the death of Jennifer Curry, is mandated by statute under 21 U.S.C. § 841(b)(1)(C) to sentence Krieger to a term of imprisonment of twenty years." *Id.* at *8.

On the other hand, the district court also occasionally used language more closely associated with but-for causation. The best support for the notion that the district court was looking at but-for causation comes from the following statement that the district court made while describing the testimony of Dr. Heidingsfelder: "[h]e testified that in his opinion, Curry's death was caused by fentanyl toxicity. He further testified that, in his opinion, the other drugs found in Curry's system did not cause her death, either taken alone or in combination." *Id.* at *3. The district court opinion also includes language hinting at but-for causation in the following:

> [i]n addition, the Court finds that the evidence presented, including the testimonies of Drs. LeVaughn, Evans and Morris–Kukoski, and the lab reports from AIT and the FBI, support, by a preponderance of the evidence, Dr. Heidingsfelder's conclusion that fentanyl toxicity was the cause of Ms. Curry's death.

*Id.* at *4. But yet, despite having said this, the district court summarized its conclusion by saying, "[h]aving weighed all the evidence presented, the Court finds that the Government has established that it is more probable than not that Ms. Krieger's distribution of fentanyl to Ms. Curry *resulted in* Ms. Curry's death." *Id.* (emphasis ours).

As we have emphasized, the confusion is not the fault of the district court, but rather a lack of clarity in the case law at the time about what type of causation was required. Before *Burrage*, it was unclear what level of causation was necessary and courts were imprecise with the language they used in finding causation. In fact, after the district court sentenced Krieger, another panel of this court issued an opinion explaining how muddled the language of causation is in the cases applying this same "death resulting" statute. *United States v. Hatfield*, 591 F.3d 945, 947 (7th Cir. 2010) (explaining causation in 21 U.S.C. § 841(b)(1)(C)). As the court explained in *Hatfield*:

> Causation is an important issue in many cases in a variety of fields of law and has been so for centuries. Yet it continues to confuse lawyers, in part because of a proliferation of unhelpful terminology (for which we judges must accept a good deal of the blame). In the space of three-and-a-half pages in the government's brief, one finds the following causal terms: proximate cause, actual cause, direct cause, but-for causation, contributing causation, contributory causation, significant causal connection, sole cause, factor in the victims' injuries, concurrent cause, meaningful role, possible cause, remote cause, and cause in fact. Black's Law Dictionary (8th

> ed.2004) lists 26 terms in the entry for "cause."
> The prosecutor was unable at oral argument sat-
> isfactorily to differentiate or explain the causal
> terms listed in his brief, or the three causal terms
> added to the instruction—"a factor that resulted
> in," "primary cause," and "played a part."

*Id.* at 947–48. In fact, so confusing was the language of causa-
tion, that although the parties in *Hatfield* agreed that the gov-
ernment had to prove but-for causation, the government's
lawyer at argument said that the words "played a part" in the
jury instructions referred to "but-for" causation. *Id.* at 948.
And in *Hatfield*, the panel set forth several examples of how
confusing the concept of "but-for" causation can be:

> suppose the ingestion of an illegal drug weak-
> ened the victim's health to the point where he
> later died of another condition that would not
> have killed him had he not ingested the drug.
> Maybe he was healthy until he ingested it, and
> after and because he ingested it his immune sys-
> tem failed and he died from an overdose of
> drugs, obtained from someone else, that would
> not have killed him but for his weakened condi-
> tion. The government's lawyer said that ingest-
> ing the first drug would not have been a but-for
> cause of the death. But it would have been: had
> the victim not ingested it, he would not have
> died when he did.

* * *

> Suppose a defendant sells an illegal drug to a
> person who, not wanting to be seen ingesting it,

takes it into his bathroom, and while he is there
the bathroom ceiling collapses and kills him.
Had he not ingested the drug, he would not
have been killed. But it would be strange to
think that the seller of the drug was punishable
under 21 U.S.C. § 841(b)(1)(C).

*Id*. The *Hatfield* panel described "but-for" causation as "an op-
portunistic concept [that] … we attach to a but-for cause (the
better term is "necessary condition," since most but-for causes
aren't considered causes at all) that we're particularly inter-
ested in, often because we want to eliminate it," that is, it is
defined by the conduct we wish to deter. *Id.* Moreover, in *Hat-
field*, we noted that just like attempts to define "beyond a rea-
sonable doubt" for a jury, attempts to define the confusing
term "but-for causation" for a jury "often make[] it less rather
than more clear." *Id.* at 949.

The lack of understanding about what level of cause was
required to make a showing of "resulted in death" led to im-
precise comments by courts and lawyers, including this very
court. In sustaining Krieger's sentence on direct appeal, we
used the term "but for" in a sentence describing the district
court's findings, despite the fact that the district court had not
used the term "but-for causation" anywhere in its opinion.
*Krieger*, 628 F.3d at 871 ("The district court properly consid-
ered, therefore, whether Curry's death would not have oc-
curred but for the ingestion of the fentanyl.") Yet throughout
the remainder of the opinion, the panel on direct appeal spoke
only of the lower court findings that Krieger "caused" Curry's
death or that death "resulted." *See id.* at 861, 867, 869, 870 ("the
district court issued its order, finding, by a preponderance of
the evidence, that the fentanyl supplied by Krieger *resulted in*

the death of Curry."); ("the court concluded that the government would not have been able to prove, beyond a reasonable doubt, that Krieger's distribution of fentanyl *was the cause of* Curry's death, had Krieger been charged with that offense. The court was persuaded, however, that a preponderance of the evidence established fentanyl as the *cause of* Curry's death, and concluded that 'the Government has established that it is more probable than not that Ms. Krieger's distribution of fentanyl to Ms. Curry *resulted in* Ms. Curry's death.'"); ("Once the court made the finding, by a preponderance of the evidence, that *death resulted*, it concluded that it was obligated to impose the mandatory statutory minimum under § 841(b)(1)(C) 'if death results'—twenty years."); ("the court found that Curry's death *resulted from* the distribution of fentanyl"); ("The district court was also correct that once it found, by a preponderance of the evidence, that *death had resulted* when Krieger distributed the fentanyl, the court was obliged to impose the mandatory minimum sentence of twenty years."); ("the district court was correct in allowing the government to prove to the court at sentencing, by a preponderance of the evidence, that Curry's death *resulted from* Krieger's distribution of fentanyl."); ("The district court took these failings into account, but nevertheless found that it was more likely than not that the fentanyl patch provided by Krieger *caused* Curry's death.")

Before *Burrage*, the district court had no reason to place "but-for causation" under a magnifying glass and see it as the linguistic key to a determination of criminal liability for death. Neither the court nor the parties had the benefit of *Hatfield* or *Burrage* at the time of sentencing and no reason to know that but-for causation was the minimum level of causa-

tion necessary to find that Curry's death resulted from the ingestion of the patch distributed by Krieger. Our own isolated use of the term but-for causation in our decision sustaining the district court's sentence on direct appeal can have no significance where the district court made no such finding and the Supreme Court had yet to declare it the requirement. It is true, of course, that by the time we issued our opinion on direct appeal, our court had decided *Hatfield*, in which it began to unravel what is required to prove that "death resulted from" the use of the controlled substance as stated in 21 U.S.C. § 841(b)(1)(C). It was clear after *Hatfield* that the government could not include in its jury instructions a statement that the controlled substance distributed by the defendant has to have been "a factor that resulted in the death or serious bodily injury," and that although it "need not be the primary cause of death or serious bodily injury" it "must at least have played a part in the death or in the serious bodily injury." *Hatfield*, 591 F.3d at 947. *Hatfield* clarified that, at a minimum, the government had to prove but-for cause. *Id.* at 948. But the *Hatfield* opinion left unanswered many questions about but-for causation. In fact, the court was critical of the term "but-for" causation noting that "but-for cause is not always (in fact not often) a cause relevant to legal liability," and, as we pointed out above, spoke of the confusion surrounding the term and the difficulties in pinning it down. *Id.* at 948.

Putting all of the pieces together: *Burrage* applies to Krieger's case on collateral review, and therefore requires that the government show that the fentanyl patch, which Krieger provided to Jennifer Curry was the "but-for" cause of Curry's death, that is, 'that the harm would not have occurred' in the

absence of—that is, but for—the defendant's conduct." *Burrage*, 134 S. Ct. at 887–88 (citing *University of Tex. Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2525 (2013)).

In its supplemental filing, the government points to evidence from experts who believed that Curry had a lethal level of fentanyl in her system and therefore concluded that the cause of Curry's death was fentanyl toxicity. In a world that did not require but-for causation, this evidence was sufficient to satisfy the "death resulting" language of the enhancement by a preponderance of the evidence, as the district court found. *Krieger*, 2009 WL 112428, at *4. Krieger, however, argues that law enforcement, medical examiners and the like, focused only on the fentanyl to the exclusion of the other drugs in Curry's system which, in a landscape requiring but-for causation, makes a difference. As Krieger notes, "if before any testing or investigation there is a 50% chance a victim died from Drug A and a 50% chance the same person died from Drug B, can causation determination be made if only Drug A was tested?" (Krieger Supplemental Brief at 9).

The government argues that these factual findings—that fentanyl caused Curry's death—are reviewed for clear error and that this court, on direct appeal, has already upheld the district court's factual findings. But this court, on direct appeal, upheld the district court's factual findings that fentanyl caused Curry's death. It did not uphold any factual finding that fentanyl was the "but-for" cause of Curry's death. It could not have done so, just as the district court, at the time of sentencing, had no reason to know that it must make a finding of but-for causation, because it had neither the guidance of *Hatfield* nor *Burrage*. And even though we had some idea, by the time of direct review, that, because of *Hatfield*, the

standard in this circuit was turning to "but-for" causation, the *Hatfield* opinion merely reinforced the notion that the term "but for" was both ill-defined and oft misused. *Hatfield,* 591 F.3d at 948-49. It was not until *Burrage* that the Supreme Court mandated that no defendant could be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless the use of the distributed substance was the but-for cause of death, a term it defined by stating "this requires proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Burrage*, 134 S. Ct. at 887, 892.

But even if this court had somehow upheld the factual findings that the government claims it did, the law of the case doctrine is "not hard and fast." *Kathrein v. City of Evanston, Ill.,* 752 F.3d 680, 685 (7th Cir. 2014). Instead, "a ruling made in an earlier phase of a litigation controls the later phases unless a good reason is shown to depart from it." *Tice v. Am. Airlines, Inc.,* 373 F.3d 851, 853 (7th Cir. 2004). And one good reason to depart from it is when, as here, there is "a decision of the Supreme Court after the first review that is inconsistent with the decision on that review." *Kathrein*, 752 F.3d at 685 (citing *Chi. & N.W. Transp. Co. v. United States*, 574 F.2d 926, 930 (7th Cir. 1978)). *Burrage* is, of course, just that case.

We therefore vacate Krieger's sentence and remand the case to the district court for de novo resentencing. Because Krieger's sentence is vacated, the district court will be resentencing Krieger on a clean slate. *See Pepper v. United States*, 562 U.S. 476, 507 (2011); *United States v. Atkinson*, 979 F.2d 1219, 1223 (7th Cir.1992) (vacation of a sentence results in a "clean slate" and allows the district court to start from scratch); *United States v. Barnes*, 948 F.2d 325, 330 (7th Cir. 1991) (same). As the district court noted in its initial opinion on sentencing,

it can consider the death of Jennifer Curry, using a preponderance of the evidence standard, as recommended under United States Sentencing Guideline § 2D1.1, which advises that a judge apply a higher base level where the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance. U.S.S.G. § 2D1.1. Implementation of the mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(C), would require that a jury find, beyond a reasonable doubt, that the fentanyl in the patch provided by Krieger was the but-for cause of Curry's death, and the time for such a determination has passed. *Alleyne*, 133 S. Ct. at 2155; *Burrage*, 134 S. Ct. at 892.

The decision of the district court is VACATED and the case is REMANDED for resentencing.