In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-1154

DONALD S. HARDEN,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee*.

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 19-C-1503 — **William C. Griesbach**, *Judge*.

_____

ARGUED DECEMBER 16, 2020 — DECIDED JANUARY 21, 2021

_____

Before WOOD, SCUDDER, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge.* A jury found Donald Harden guilty of conspiring to distribute heroin and further found that a death had "resulted from" the use of that heroin. Based on that finding, he was sentenced to life in prison under 21 U.S.C. § 841(b)(1)(B), the so-called "death-results" provision. This provision increases the maximum statutory term of imprisonment for a drug offense from 40 years to life on a finding that "death or serious bodily injury result[ed] from the use of [the]

substance."

After an unsuccessful direct appeal, Harden moved under 28 U.S.C. § 2255 to vacate his sentence. He asserted that his trial counsel was ineffective in two ways: first, for agreeing to a jury instruction that repeated the text of § 841(b)(1)(B) but did not elaborate that his heroin had to be the "but-for" cause of the victim's death; second, for failing to present expert testimony to rebut the government's evidence that his heroin caused the victim's death. The district court denied his motion without an evidentiary hearing. On appeal, Harden renews his arguments that counsel was ineffective and contends that the district court abused its discretion by denying his motion without a hearing. Neither argument has merit, so we affirm.

## I. Background

### A. The Offense and Trial

On September 5, 2014, Frederick Schnettler was found dead in his bedroom from an apparent heroin overdose. Dr. Kristinza Giese, a medical examiner, performed an autopsy and ruled that the cause of death was "acute heroin toxicity." Schnettler's friend, Kyle Peterson, had sold him heroin the day before, sometime before Schnettler died around 10:30 p.m. Peterson got that heroin from one of Harden's associates, Brandi Kniebes-Larsen.

Harden was eventually charged with conspiring to distribute the heroin that resulted in Schnettler's death, and the case against him focused largely on Peterson's delivery of 0.1 grams of heroin to Schnettler on the day he died. At trial, the parties presented competing timelines of the delivery. The government contended that Peterson delivered Harden's

heroin between 7:30 and 8:00 p.m. and that Schnettler died from it shortly thereafter. The defense countered that Schnettler received and used Harden's heroin by 5:00 p.m., did not get high from it, and overdosed on heroin or morphine he obtained from another source later that evening.

The government's case began with Dr. Giese, the medical examiner. Based on an examination of Schnettler's body, she opined that he died from a fatal dose of heroin. A toxicology report, which showed that Schnettler's urine contained morphine and another heroin metabolite, confirmed her opinion. She explained that she would have seen a higher level of morphine, beyond what metabolizes from heroin, if he had taken morphine separately. Regarding when Schnettler consumed the fatal dose, she said that death can occur between several minutes to hours after a heroin injection, depending on its potency. She explained that if Schnettler was communicative at 8:00 p.m. on the day he died (as shown in the text exchange below, evidence suggests that he was), it would be "a little bit surprising" for a dose injected by 5:00 p.m. to have killed him.

Kyle Peterson testified next. He said that the heroin he delivered the day Schnettler died came from Harden by way of Brandi Kniebes-Larsen. He bought it from her that afternoon and got high. Later, between 7:00 p.m. and 8:00 p.m., he drove to Schnettler's to hand off 0.1 grams, which Schnettler used. The next morning, Peterson said, he overdosed on the remaining heroin around the time Schnettler was found dead. He acknowledged that he "might have" initially told police he drove to Schnettler's immediately after buying heroin in the afternoon. But, he said, he misspoke because he was still shaky from his overdose and did not yet know that Schnettler was dead when he gave that statement.

To suggest that Peterson had delivered heroin to Schnettler earlier in the day, Harden's counsel introduced the following text messages and call logs, showing attempts by Schnettler to get heroin from Peterson after 5:00 p.m.:

> 5:09 p.m. Schnettler: "It short for sure cus I thought last nights was small and this is way smaller also last nights was better"

> 5:14 p.m. Peterson: "Yeah ik a couple other ones were too, Im grabnimg more of lastnight quality as we speaj"

> 5:15 p.m. Schnettler: "Yeh dude I've almost done all of it and I'm not even high"

> 5:21 p.m. Peterson: "Oh wow. I'm sorry man. I got some thing for you bud."

> 5:22 p.m. Schnettler: "How bout drop me another one off tonight"

> 5:24 p.m. Peterson: "That's what I'm saying"

> 5:26 p.m. Schnettler: "Ima shower quick then I'll call yah"

> 5:39 p.m. Peterson: "Ight just grabbed that grey shit from lastnight so I got you"

> 5:45 p.m. Schnettler: "Can u come this way quick"

> 5:58 p.m. Peterson: "Yeah I can before I head to appleton"

> 5:59 p.m. Schnettler: "Eta"

> 6:17 p.m. [Schnettler calls Peterson]

6:18 p.m. [Schnettler calls Peterson]

6:42 p.m. [Peterson calls Schnettler]

7:01 p.m. Schnettler: "Were the fuck are you"

7:04 p.m. [Schnettler calls Peterson]

7:04 p.m. Schnettler: "Hello"

7:09 p.m. [Schnettler calls Peterson]

7:38 p.m. Schnettler: "U on ur way"

7:39 p.m. Peterson: "Yessir"

7:40 p.m. Schnettler: "Eta"

7:41 p.m. Schnettler: "?"

7:42 p.m. [Schnettler calls Peterson]

8:40 p.m. [Schnettler calls Peterson]

8:53 p.m. [Schnettler calls Peterson]

After 9:00 p.m., Schnettler did not communicate further with Peterson but texted his friends, posted on Facebook, and sent a final text message to his mother at 10:20 p.m. Despite this evidence, Peterson insisted that he delivered heroin to Schnettler only once that day, and that the delivery occurred between 7:00 p.m. and 8:00 p.m.

Finally, the jury heard from Kniebes-Larsen. She testified that Harden was her only source of heroin and on the day of Schnettler's death, she met with Harden to obtain some. Harden warned her that she "needed to be very careful [with it] because apparently there were bodies on [it]." She delivered that heroin to Peterson between 5:00 p.m. and 6:00 p.m. When she was arrested the next day, she swallowed a bag with 1.5 grams of the same heroin (about 15 times the amount

that Peterson delivered to Schnettler) and survived. Although she thought it was weak, she explained that heroin affects people differently.

Before the close of evidence, the district court conferred with the parties about the jury instructions and the verdict form. Harden's counsel said that the government's proposed instructions looked "reasonable" and he had no "particular battle over anything." For the special-verdict question about Schnettler's death, the parties agreed on the following language drawn from the text of § 841(b)(1)(B): "Did the death of Frederick J. Schnettler result from his use of heroin distributed by defendant Donald S. Harden?" Adhering to the parties' agreement, the court instructed the jury on this question as follows:

> The United States does not have the burden of establishing that the Defendant intended death—intended that death resulted from the distribution or the use of the controlled substance, nor does the United States have the burden of establishing that the Defendant knew or should have known that death would result from distribution of the controlled substance by the Defendant. If you find the Government has proven beyond a reasonable doubt that Frederick J. Schnettler died as a result of the use of heroin distributed by the Defendant, then you should answer question number one "yes."

During deliberations, a juror asked: "Can we factor in other possibilities not presented?" The court said "yes" and reminded the jury to use "common sense in weighing the evidence and consider the evidence in light of your own

everyday experience." The jury found Harden guilty of conspiracy to distribute heroin. It answered "yes" to the special-verdict question asking whether Schnettler's death "result[ed] from" heroin distributed by Harden. Based on this finding, the district court sentenced Harden to life in prison under the death-results provision in § 841(b)(1)(B).

### B. Post-Conviction Events

On direct appeal, Harden challenged (among other things) the sufficiency of the evidence showing that his heroin was the but-for cause of Schnettler's death and the adequacy of the instruction on causation. This Court rejected both challenges. *United States v. Harden*, 893 F.3d 434 (7th Cir. 2018). We acknowledged that the record contained evidence that Harden's heroin was not potent enough to kill and that the defense had undermined the credibility of the witnesses who supported the government's timeline. *Id.* at 447. But, we concluded, a jury could reasonably find based on the evidence that Harden's heroin reached Schnettler between 7:00 p.m. and 8:00 p.m. and that he overdosed on it shortly afterward. *Id.* at 446. We further held that Harden had waived his challenge to the instruction on causation by expressly agreeing to it. *Id.* at 450–51.

Represented by new counsel, Harden has now moved for collateral relief under 28 U.S.C. § 2255. He argues that counsel was ineffective for agreeing to a death-results jury instruction that failed to adequately explain the government needed to prove Schnettler would not have died "but for" the heroin Harden distributed. He further faults trial counsel for failing to present expert testimony rebutting that the low amount of heroin (0.1 grams) was enough to cause Schnettler's death. The district court denied his motion without an evidentiary

hearing. It ruled that the jury instruction accurately stated the law. Further, nothing showed that a jury could not understand that the "resulting from" language in the instruction required the heroin to be the but-for cause of Schnettler's death. It also concluded his allegations offered no reason to believe that an expert could have provided useful testimony.

## II. Analysis

In reviewing denials of § 2255 motions, we review the district court's legal conclusions de novo and its decision to forgo an evidentiary hearing for abuse of discretion. *Martin v. United States,* 789 F.3d 703, 705 (7th Cir. 2015).

### A.  Jury-Instruction Claim

To prevail on his jury-instruction claim, Harden needed to show both that counsel's performance was objectively deficient and that he was prejudiced by it. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). Failure to object to a defective or confusing jury instruction may reflect deficient performance. *See Cupp v. Naughten,* 414 U.S. 141, 146–47 (1973); *Baer v. Neal,* 879 F.3d 769, 777–79 (7th Cir. 2018).

Harden maintains that his trial counsel was ineffective for agreeing to a jury instruction that did not explicitly state that his heroin needed to be the "but-for" cause of Schnettler's death. He insists that the instruction was defective because, although it recited the language from 21 U.S.C. § 841(b)(1)(B), it did not explain that language. And, because we noted during his direct appeal that the evidence of Schnettler's cause of death conflicted, he sees a reasonable probability that a properly instructed jury would have reached a different verdict. In our view, though, Harden has met neither of the two prongs of the *Strickland* test.

To begin, Harden cannot show that counsel performed deficiently. He relies on *Burrage v. United States,* 571 U.S. 204 (2014), to argue that counsel agreed to a defective jury instruction. He views *Burrage* as requiring an explicit "but-for" instruction before a defendant may receive a death-enhanced sentence under § 841(b)(1)(B). But in *Burrage* the Supreme Court held only that a defendant cannot receive a death-enhanced sentence unless his drugs were an "independently sufficient" cause of death, not simply a "contributing cause," as some circuits had ruled. *Id.* at 218–19. Embracing the statute's text, the Court reasoned that "[t]he language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which the drug use merely contributed." *Id.* at 216. Precisely because it highlighted the importance of the text, *Burrage* did not state that an instruction using the "result from" text of § 841(b)(1)(B) was defective.

In light of *Burrage* and the facts of this case, counsel's performance was not deficient. First, in the context of this case, the instruction was a correct statement of the law. Because no evidence would have led the jury to find that heroin was merely a "contributing" cause of Harden's death, competent counsel would not suspect that the instruction might be confusing. Also, this court previously found no fault in an instruction identical to the one Harden challenges, so counsel had no reason to deviate from it. The last time we considered a death-results instruction, we rejected an attempt to embellish the statutory language, explaining that the statute "was a good deal clearer than the addition and probably clear enough." *United States v. Hatfield,* 591 F.3d 945, 949 (7th Cir. 2010). True, *Hatfield* was decided before *Burrage.* But *Burrage* did not abrogate it. To the contrary, *Burrage* cited *Hatfield*

favorably. *See Burrage,* 571 U.S. at 211.

Harden replies that *Krieger v. United States,* 842 F.3d 490 (7th Cir. 2016), has since undermined *Hatfield*. But, as he admits, *Krieger* was not a jury-instruction case. There, we vacated a death-enhanced sentence because the sentencing order was so "awash in confusion about what causation means" that we could not tell if the district court had used the correct standard. *Id.* at 501. The confusion was compounded by "a lack of clarity in the case law at the time about what type of causation was required." *Id.* at 502. Since *Hatfield,* we have not revisited whether a death-results instruction requires more than the statutory text. And *Krieger* was decided after Harden's trial, so counsel cannot be faulted for not using it as a basis for an objection.[*]

Harden also attempts to draw support from three out-of-circuit cases for the proposition that counsel's failure to demand an elaboration on § 841(b)(1)(B)'s statutory text can be reversible error. *See Santillana v. Upton,* 846 F.3d 779, 785 (5th Cir. 2017); *United States v. Alvarado,* 816 F.3d 242, 248–49 (4th Cir. 2016); *United States v. MacKay,* 610 Fed. App'x 797, 799 (10th Cir. 2015). But *Alvarado* actually approved an unadorned "death-results" instruction like the one in this case and commented only that, in a mixed-toxicity case (like the other two

---

[*] As we make clear, counsel was not ineffective for agreeing to the jury instruction that tracked the language of the statute and our prior opinion in *Hatfield*. In light of *Burrage*, we invite our Circuit's Pattern Criminal Jury Instruction Committee to consider adding a pattern jury instruction for the death-results provision in 21 U.S.C. § 841(b)(1)(B) and evaluate whether some deviation from the language in the statute would be appropriate in certain circumstances.

that Harden cites), "a court's refusal to clarify the phrase 're-sults from' might become a problem." 816 F.3d at 248–49. Schnettler died from the toxicity of a single drug, so the concern of those cases is absent here.

Even if counsel's stipulation to the instruction were deficient, Harden cannot show that he was prejudiced by it. He insists that the jury's single question to the court ("can we factor in other possibilities") shows that jurors did not understand the death-results instruction. But the question has none of the required context. *See Cupp,* 414 U.S. at 146. And as discussed above, nothing about the context of this trial suggests that, like in *Burrage,* the jury believed that it could hold the defendant liable for a death if heroin was only a "contributing cause." Rather, the trial focused on competing timelines of the heroin delivery. Dr. Giese, the only witness who testified about causation, stated that Schnettler died from a heroin overdose. Her testimony highlighted that Harden's liability depended on when Schnettler had received heroin from Peterson: if he used it by 5:00 p.m. on the day of his death, as Harden contended, rather than around 7:30 p.m. as the government countered, then it would be "a little bit surprising" for him to have overdosed on it and still be texting friends at 8:00 p.m. And during closing arguments the parties emphasized that the issue before the jury depended on its evaluation of the competing evidence of when Schnettler received and used Harden's heroin. Thus, the absence of a "but-for" definition on the instruction does not undermine confidence in the verdict. *Strickland,* 466 U.S. at 686.

## B.  Evidentiary Hearing

Harden's next argument fares no better. He contends that the district court abused its discretion by refusing to hold a hearing on his claim that his trial counsel should have called a medical expert. An evidentiary hearing on a § 2255 motion is required unless the record "conclusively show[s] that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006) (internal citations omitted). Harden insists that his § 2255 motion, which faults counsel for "fail[ing] to present medical expert testimony regarding the statistical likelihood that ingesting 0.1 grams of heroin could have caused the victim's death," adequately alleged facts entitling him to a hearing.

The district court correctly concluded that none of Harden's allegations would entitle him to relief. First, he did not allege that counsel failed to consult with an expert or that the decision not to call one was anything but strategic. To the contrary, our review of the record shows that counsel told the district court that he had "retain[ed] and consult[ed] with a toxicology expert relating to the death." In some cases, if counsel fails to consult an expert who could provide exculpatory evidence, and if a defendant pleads guilty instead of going to trial, failure to consult an expert may reflect deficient performance. *See, e.g., Anderson v. United States*, 981 F.3d 565, 574 (7th Cir. 2020); *Carter v. Duncan*, 819 F.3d 931, 942 (7th Cir. 2016). But, given the evidence that counsel did consult an expert, the decision not to call that expert "is a paradigmatic example of the type of strategic choice that, when made after thorough investigation of the law and facts, is virtually unchallengeable." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (citations omitted).

Second, Harden does not allege that he can adduce expert evidence suggesting that the ingestion of 0.1 grams of heroin is not lethal. *See Long v. United States*, 847 F.3d 916, 920 (7th Cir. 2017). Without such an assertion or support, his petition merely reprises his challenge on direct appeal to the sufficiency of the evidence against him. Harden points out that the medical examiner never said that "death could result from .1 grams of heroin" and that "another witness testified that she ingested 15 times that amount of the same heroin with no ill effect." True, the only evidence that the heroin Peterson delivered was potent enough to be lethal came from Kniebes-Larsen (who did not suffer any ill effects from it but suggested that it could be lethal) and Peterson (who said that he overdosed on it). Even though this court previously recognized that this evidence was weak, however, the jury was nonetheless permitted to accept it. *See Harden*, 893 F.3d at 447. Without a showing that the expert testimony he now faults trial counsel for not introducing even exists, a bare challenge to the sufficiency of the evidence does not justify collateral relief. *See Ellison v. Acevedo*, 593 F.3d 625, 634 (7th Cir. 2010).

AFFIRMED