In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2437

JOSEPH PERRONE,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:14-cv-00281-DRH — **David R. Herndon**, *Judge*.

ARGUED JANUARY 4, 2018 — DECIDED MAY 14, 2018

Before WOOD, *Chief Judge*, and HAMILTON and BARRETT, *Circuit Judges*.

BARRETT, *Circuit Judge*. Terry Learn died after Joseph Perrone injected her with 7.5 grams of cocaine. Perrone pleaded guilty to a single count of unlawful drug distribution and stipulated that his distribution of the cocaine had caused Learn's death. In accordance with Perrone's plea agreement, the district court applied a statutory sentencing enhancement that mandates a twenty-year minimum term of impris-

onment if unlawful drug distribution results in death. The Supreme Court has since clarified that this provision requires a defendant's drugs to be a but-for cause of the death, not merely a contributing cause. Perrone filed a petition for relief under 28 U.S.C. § 2255 on the ground that the Court's narrowed interpretation of the enhancement reveals that he is actually innocent of causing Learn's death. In addition, he asserts that his counsel was ineffective for failing to advise him of a Seventh Circuit case decided on the day before his sentencing that interpreted the "death results" enhancement the same way that the Court ultimately did. He claims that if he had known that the enhancement required the government to show that his cocaine was the but-for cause of Learn's death, he would have sought to withdraw his plea. The district court denied Perrone's petition, and we affirm its judgment.

## I.

At approximately 4 a.m. on April 17, 2008, Terry Learn and her coworker Madonna Narog went to Narog's hotel room, where they did heroin and cocaine for several hours. They left the hotel around 8 a.m. to purchase more cocaine, about fifty dollars' worth for Learn and twenty-five dollars' worth for Narog. They returned to the hotel and did cocaine until close to noon, when Learn left for her shift at Roxy's Night Club. Narog saw Learn again around 2 p.m., when Narog went to the club to pick up some money, and again at 8 p.m., when Narog was beginning her shift and Learn was ending hers.

After her shift, Learn met her boyfriend, Joseph Perrone, and went back to his home. According to Perrone, the two made a suicide pact. After watching Learn inject herself with

a mixture of cocaine and water, Perrone told her that she had not taken enough to kill herself. He then prepared and injected 7.5 grams of cocaine into Learn. Perrone later told the police that Learn convulsed, fell to the floor, and died immediately after he injected her for the last time. He did not specify the time at which he administered the final injection, but he said that it happened on April 18th. It was therefore at least four hours after Narog saw Learn at the shift change and at least twelve hours after Narog last saw her do any drugs not distributed by Perrone.

Perrone moved Learn's body to her apartment. He wiped his fingerprints off the syringe and put it into Learn's hand. As he stipulated in his plea agreement, he aimed "to create the false impression that Terry Learn had died alone in her own residence." The body was not discovered until April 26th, when a concerned neighbor flagged down police to report that she had not seen Learn in several days. Police officers discovered Learn's body in her apartment. According to the coroner's report, the cause of death was "[c]ombined toxicity with cocaine, ethanol and opiates."

Several months later, Perrone was arrested on an unrelated firearms charge. He chose that time to confess to police that he had killed Learn, describing what he had done as "premeditated murder." During this interview, he told the police that he gave Learn one injection of an unspecified amount of cocaine; during a second interview a few weeks later, he said that he injected Learn with 7.5 grams of cocaine in three separate injections of 2.5 grams each.

The government obtained an indictment against Perrone for distributing a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The indictment specified

that Learn died as a result of Perrone's distribution, which, if proved, would enhance his statutory sentencing range under § 841(b)(1)(C). That provision mandates a twenty-year minimum sentence if "death or serious bodily injury results from the use" of the unlawfully distributed substance.

Perrone pleaded guilty. In his plea agreement, he admitted that his conduct had violated the "death results" provision—namely, he stipulated that "the ingestion of the controlled substance distributed by the Defendant caused the death of another person." He also signed a stipulation of facts admitting that he "injected Terry Learn with a syringe containing cocaine" and that she "died immediately after receiving the injection." At his plea hearing a few weeks later, Perrone stated that he had read the documents, that he understood them, and that they were accurate.

On the day before Perrone was sentenced, the Seventh Circuit decided *United States v. Hatfield*, 591 F.3d 945 (7th Cir. 2010), which held that the "death results" enhancement requires the government to prove that "ingestion of the defendants' drugs was a 'but for' cause of the death[]." *Id.* at 948. *Hatfield* rejected jury instructions that used vaguer, less demanding language to describe the necessary causal relationship; it said that the district court could not summarize the "death results" enhancement as requiring the jury to find only that the illegal drugs "played a part" in the victim's death. *Id.* at 949.

At sentencing the next day, the district court applied the "death results" enhancement and sentenced Perrone to 240 months' imprisonment. Before imposing the sentence, the district judge said that he had reviewed Perrone's Stipulation of Facts to see "what impact, if any, the Rex Hatfield case

was going to have on this case." Perrone's attorney did not engage this point with the judge, nor did he inform Perrone about *Hatfield*. Instead, he once again agreed that the sentencing enhancement applied. Perrone did not appeal his sentence. He eventually received an 80-month reduction of his sentence for assistance to the government, a possibility contemplated by the plea agreement and that Perrone and the district court had discussed at his sentencing hearing.

Four years later, the Supreme Court decided *Burrage v. United States*, 134 S. Ct. 881 (2014), which effectively ratified *Hatfield*'s standard of causation. The Court held that the "death results" enhancement ordinarily requires the government to prove that the victim would have lived but for the unlawfully distributed drugs. *Id.* at 888. In *Burrage*, the victim died with multiple drugs in his bloodstream, including metabolites from heroin that had been distributed by the defendant. Although morphine, a heroin metabolite, was the only drug present at a level above the therapeutic range, the government's experts could not say whether the victim would have lived if he had not taken the heroin. They testified only that heroin was a "contributing factor" to a death caused by "mixed drug intoxication." That testimony dovetailed with instructions requiring the jury to find "that the heroin distributed by the Defendant was a contributing cause of [the victim's] death." *Id.* at 886. The Court said that the statute requires the government to show more than that the distributed drug contributed to the victim's death. The enhancement applies when "death or serious bodily injury results from the use of [the distributed] substance," which means that the substance must be a "but for" cause of the death. *Id.* at 887–88.

Within a month of *Burrage*, Perrone filed a petition to vacate or alter his sentence pursuant to 28 U.S.C. § 2255. His initial petition asserted that the new interpretation of the "death results" enhancement announced in *Burrage* renders him actually innocent of causing Learn's death. In his reply brief below, Perrone added a claim that his attorney had been constitutionally ineffective for not telling him about *Hatfield*.

The district court dismissed Perrone's claims with prejudice. We granted a certificate of appealability on three questions: whether Perrone was actually innocent of his sentence under *Burrage*, whether Perrone's sentencing counsel had been constitutionally ineffective for failing to address the issue of causation in light of *Hatfield*, and whether Perrone's plea was knowing and voluntary. Perrone presses only the first two of these arguments on appeal.

**II.**

Perrone's strongest argument is that he is actually innocent of the "death results" sentencing enhancement. He claims that when he entered his plea agreement and pleaded guilty, he did not know that the enhancement required but-for causation. Since then, *Burrage* has made the standard clear, and under it, he says, there is insufficient evidence to show that Learn's death resulted from the cocaine he gave her. Although Perrone generally waived his right to raise collateral challenges, the waiver excludes collateral attacks based on "any subsequent change in the interpretation of the law" by the Supreme Court that is declared retroactive and renders Perrone innocent.

**A.**

The government contends that Perrone procedurally de-faulted his *Burrage* claim by failing to raise it on direct appeal. *McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016) ("A claim cannot be raised for the first time in a § 2255 motion if it could have been raised at trial or on direct appeal."). In response, Perrone has invoked the "actual innocence" exception, which permits a petitioner to assert a defaulted claim if he "can demonstrate that he is 'actually innocent' of the crimes of which he was convicted." *Id.* Perrone's invocation of this exception means that "actual innocence" does double duty in this case: it is both what Perrone must show to overcome procedural default and the standard he must satisfy to prevail on the merits of his *Burrage* claim.

Perhaps because of this overlap, both parties assume (as did the district court) that the "actual innocence" exception to procedural default is available to Perrone. That assumption is doubtful. The point of the exception is to ensure that "federal constitutional errors do not result in the incarceration of innocent persons." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). The Supreme Court has flagged the possibility that actual innocence might be enough to justify collateral relief in a capital case on the theory that the execution of one who is actually innocent violates the Eighth Amendment. *Id.* at 405. Apart from that potential exception, however, the Court's "habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 404. This is a problem for Perrone. He does not ask us to determine that he is actually in-

nocent so that we can consider a claim of constitutional error; rather, his innocence of the "death results" enhancement is the error he asks us to correct.[1]

The government, however, has not made this argument. Instead, apparently believing that default and the merits will rise or fall together, it has treated Perrone's assertion of the "actual innocence" exception as functionally no different from his claim on the merits to be actually innocent of the "death results" enhancement. Procedural default is a waivable defense, not a jurisdictional bar. We treat the government as having waived the defense and analyze Perrone's petition on the merits.

---

[1] Perrone's petition for a certificate of appealability appeared to connect his *Burrage* claim to a constitutional argument insofar as he sought review of the question whether his plea was "knowing and voluntary." *Cf. Bousley v. United States*, 523 U.S. 614, 623 (1998) (holding that petitioner could seek relief on his otherwise procedurally barred claim that his guilty plea was not voluntary and intelligent if he could demonstrate his actual innocence of the offense to which he had pleaded guilty). But Perrone abandoned that argument on appeal as a separate ground for relief. He mentions it only in the context of his claim that he received inadequate assistance of counsel; he contends that if his lawyer had told him about *Hatfield*, he would have been able to withdraw his plea as not knowing and voluntary. His ineffective-assistance claim is not the constitutional claim for which "actual innocence" serves as the gateway, because that claim is not procedurally defaulted. *Vinyard v. United States*, 804 F.3d 1218, 1227 (7th Cir. 2015) ("The Supreme Court has definitively held that ineffective-assistance claims need not be presented on direct appeal to preserve them for collateral attack under § 2255….").

**B.**

Perrone's petition claims that the Supreme Court's narrowed interpretation of the "death results" enhancement renders him actually innocent of causing Learn's death. The Supreme Court has held that when a subsequent statutory interpretation narrows the elements of a crime, revealing that the petitioner has been convicted and sentenced for "an act that the law does not make criminal," the petitioner has suffered "a complete miscarriage of justice" that justifies relief under § 2255. *Davis v. United States*, 417 U.S. 333, 346–47 (1974). We have extended the reasoning of *Davis* to mandatory sentencing enhancements. In *Narvaez v. United States*, 674 F.3d 621, 627–28 (7th Cir. 2011), we held that when a petitioner's sentence is increased by application of an enhancement of which he was actually innocent, the petitioner has suffered a "miscarriage of justice" cognizable under § 2255(a). *See also Brown v. Caraway*, 719 F.3d 583, 588 (7th Cir. 2013) (holding that a claim identical to the one raised under § 2255(a) in *Narvaez* "constitutes a miscarriage of justice corrigible in a § 2241 proceeding."). Thus, regardless whether we treat Perrone's petition as challenging his conviction or his sentence (a choice that bears on the standard of review, as we explain below), Perrone has stated a claim under § 2255.

The parties agree that Perrone has a cognizable claim,[2] but they disagree about the standard we should apply in as-

---

[2] While the government concedes that Perrone's claim is viable under our precedent, it invites us to overrule that precedent. We decline the invitation.

sessing whether Perrone is actually innocent of causing Learn's death. Perrone argues that the standard should be the one that *Schlup v. Delo* provides for determining "actual innocence" in the context of procedural default. In *Schlup*, the Court held that "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." 513 U.S. 298, 327 (1995). The government, in contrast, says that Perrone must show that it is more likely than not that no reasonable judge would have found him guilty by a preponderance of the evidence. The government's insistence on a "preponderance" standard is grounded in its belief that we must treat Perrone's petition as asserting innocence of a sentencing factor rather than innocence of an element of the crime.

The government stresses that when Perrone pleaded guilty and was sentenced, the "death results" enhancement was treated as a sentencing factor that a judge could find by a preponderance of the evidence. That changed with *Alleyne v. United States*, 570 U.S. 99 (2013), which held that any fact that increases the mandatory minimum sentence for a crime is an element of a crime that must be submitted to a jury and found beyond a reasonable doubt. *Alleyne*, however, is not retroactive on collateral review. *Crayton v. United States*, 799 F.3d 623, 624 (7th Cir. 2015). The government reasons that this means that we must evaluate the sufficiency of the evidence supporting the application of the enhancement to Perrone as the issue would have been resolved at the time Per-

rone was sentenced: through the eyes of a judge and by a preponderance standard.[3]

The government's position is inconsistent with our holding in *Krieger v. United States*, 842 F.3d 490 (7th Cir. 2016). There, in holding that *Burrage* announced a substantive rule that applies retroactively on collateral review, we described the "death results" enhancement as the Supreme Court did in *Burrage*: as an element of the crime. *Krieger*, 842 F.3d at 500 ("[T]he rule announced in *Burrage* altered the range of conduct that the law punishes."); *Burrage*, 134 S. Ct. at 887 (characterizing the "death results" enhancement as "an element that must be submitted to the jury and found beyond a reasonable doubt"). Had we thought ourselves bound by *Alleyne*'s non-retroactivity (which we acknowledged) to treat *Burrage* as changing only the scope of a sentencing factor, we presumably would have relied on *Narvaez* when we held that Krieger's *Burrage* error was cognizable under § 2255. Instead, consistent with *Burrage*'s treatment of the enhancement as an element of the crime, we relied on the progeny of *Davis v. United States*, 417 U.S. 333 (1974) to hold that Krieger

---

[3] The government also asserts that Perrone's petition described his challenge as going to his sentence rather than his conviction and that this is another reason we should treat it that way. Gov't Brief at 24 (quoting Perrone's petition, which provided that "the Petitioner['s] sentence exceeds that which is otherwise authorized by law and Perrone, in light of *Burrage*, *supra*, should be resentenced accordingly"). Putting aside whether that is a fair characterization of Perrone's pro se petition, we are not bound to accept a party's characterization of a question of law. *Krieger v. United States*, 842 F.3d 490, 499 (7th Cir. 2016) ("Of course we are not bound to accept the government's concession [that *Burrage* is retroactive] when the point at issue is a question of law.").

could assert her claim. *Krieger*, 842 F.3d at 497–500. It is worth noting that the government itself conceded in *Krieger* that "*Burrage* is substantive because it defines an essential element of a federal crime…." 842 F.3d at 497. And even in circuits that maintain—contrary to our approach in *Narvaez*—that a challenge to a mandatory sentencing enhancement is not cognizable on collateral review, *Burrage* claims are cognizable precisely because they go to the validity of a conviction rather than to the validity of a sentence. *Compare Sun Bear v. United States*, 644 F.3d 700, 705 (8th Cir. 2011) (en banc) (holding that an error under the mandatory guidelines was not a miscarriage of justice because the petitioner's sentence remained "within the statutory maximum authorized for the offense"), *with Ragland v. United States*, 784 F.3d 1213, 1214 (8th Cir. 2015) (holding that a petitioner's challenge under *Burrage* is "a challenge to the validity of his conviction").

To be sure, *Krieger* did not address the standard of review that would be applicable when a court collaterally reviews whether there is sufficient evidence to support application of the enhancement according to *Burrage*'s standard of but-for causation. In that respect, *Krieger* technically leaves the standard-of-review question open. Yet it would be in significant tension with *Krieger*'s treatment of the enhancement as an element of the crime to review Perrone's claim under the regime previously applicable to sentencing factors.

We thus reject the government's attempt to slice *Burrage*'s characterization of the "death results" enhancement (as an element of crime) away from its definition of what application of that enhancement requires (but-for causation). Because *Alleyne* is not retroactive, Perrone could not get relief on the ground that the "death results" question went to a

judge rather than jury. Once he is before us with a cognizable claim, however, there is no reason for us to describe his claim as something it is not. *Burrage*, unlike *Alleyne*, is retroactive, and it makes clear that Perrone's claim goes to his innocence of a crime, not a sentence. Whether the government has proven an element of the crime is always a question for the jury. That means that Perrone's burden is to show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt of causing Learn's death. *Schlup*, 513 U.S. at 327.

## C.

This dispute is about causation, so we will begin by clearly stating what "but for" causation requires. It does not require proof that the distributed drug was present in an amount sufficient to kill on its own. The Court explained in *Burrage* that death can "result[] from" a particular drug when it is the proverbial "straw that broke the camel's back." 134 S. Ct. at 888. As the Court put it: "if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived." *Id.* Here, then, the fact that other substances in Learn's bloodstream played a part in her death does not defeat the government's claim that her death resulted from the cocaine Perrone gave her. A jury could have found him guilty of causing her death if it concluded beyond a reasonable doubt that Perrone's cocaine pushed her over the edge.

In *Burrage*, the Court left open the possibility that the government could prove causation another way: it said that strict "but-for" causation might not be required when "mul-

tiple sufficient causes independently, but concurrently, produce a result." 134 S. Ct. at 890. In other words, the "death results" enhancement might apply to a defendant who distributes a lethal dose of cocaine to a person who also consumes a lethal dose of heroin. The government suggests that a jury could have found Perrone guilty on this theory as well, because Perrone gave Learn a lethal amount of cocaine. We need not decide whether this second theory is viable, however, because there is sufficient evidence to have permitted a jury to find Perrone guilty on the first.

Perrone admitted that he distributed 7.5 grams of cocaine to Learn in a deliberate attempt to kill her, that he personally injected Learn with cocaine intending to kill her, and that she convulsed and died immediately after he injected her. That in itself strongly supports the conclusion that Learn's death resulted from the cocaine Perrone administered. It also distinguishes Perrone from the defendants in *Burrage*, *Hatfield*, and *Krieger*, none of whom stated that they had distributed the drug to the user with the intent to kill.

The best evidence on Perrone's side is the coroner's report, which listed the cause of death as "[c]ombined toxicity with cocaine, ethanol and opiates." This, Perrone says, is the kind of evidence the Court found insufficient to establish causation in *Burrage*. There, a state medical examiner testified that the drug user died of "mixed drug intoxication," with a number of substances, including the heroin distributed by the defendant, all playing a "'contributing' role." *Burrage*, 134 S. Ct. at 886. And the two medical experts who testified at the defendant's trial stated that they could not say whether the drug user would have lived had he not taken the defendant's heroin. *Id*. at 885–86. So here, Perrone says,

the coroner's report indicates that cocaine combined with other drugs to cause Learn's death. And when the coroner, Dr. Raj Nanduri, testified before the grand jury, she never expressly opined that Learn would have lived if she had not consumed the cocaine Perrone gave her.

Before the grand jury, the government seemed focused on eliciting testimony that the cocaine Perrone distributed was independently sufficient to kill Learn. Nanduri repeated the conclusion she reached in the autopsy report: that Learn's cause of death was the combined toxicity of cocaine, ethanol, and opiates.[4] When the prosecutor followed up with a question about which substance was "primarily responsible for her death," Nanduri clarified that "if she just had cocaine in her system and the other two drugs were not present, then cocaine would be the toxic agent that killed her." The prosecutor returned to this point a few minutes later, saying "I don't mean to beat this into the ground, but it is a very important point for us. It is your testimony under oath that to a medical certainty this quantity of cocaine found in this woman's blood would have killed her all by itself?" Nanduri replied "yes." Nanduri repeated several more times before the grand jury that the cocaine in Learn's bloodstream was a lethal dose. She did not, however, testify that alcohol and morphine in Learn's system were *not* lethal. She said that the alcohol was not at a level she would expect to be fatal, but she expressed uncertainty about the role the morphine had played in Learn's death. Although Learn's morphine level

---

[4] Nanduri testified that she used the term "opiates" because heroin and other opiates are metabolized into morphine, which is what Nanduri identified in Learn's blood.

was low, Nanduri explained that whether such a low dose could kill a person depends on numerous factors, including the person's past history of using opiates. She also said that a person's morphine level might be deceptively low if the person became comatose and continued metabolizing the morphine before dying.

Nanduri's testimony thus does not establish that cocaine was the but-for cause of Learn's death. But the government has testimony from another expert, Dr. Chris Long, who did expressly state that Learn would have lived but for the cocaine. Long prepared a toxicology report on Learn's body in 2008. After reviewing his report in 2014, he confirmed that the alcohol would not have killed Learn "absent the cocaine" and that "[t]he opiate is of no significance." A reasonable juror could credit Long's testimony.

Perrone's best response is to say that even if cocaine caused Learn's death, the cocaine that killed her was not the cocaine he gave her. Learn had, after all, done a fair amount of cocaine with Narog the day before. And given her pattern of cocaine use, it is at least possible that Learn did some cocaine during her shift at work. Perrone may have injected cocaine into a woman with an already-lethal amount of cocaine in her body.

This evidence helps Perrone, but only a little. There is no evidence that Learn acquired or took any cocaine between starting her shift at noon and meeting up with Perrone sometime after the 8 p.m. end of her shift, and Narog testified before the grand jury that it was not usually possible to take drugs while at work. Furthermore, even if Learn took some cocaine between noon and whenever she met up with Perrone, a rational factfinder could easily conclude that she

would have taken only a nonlethal dose. Narog testified before the grand jury that Learn was a practiced drug user who was very particular about the amount of cocaine she injected and rarely varied. That evidence paints a picture of a woman who met up with Perrone while she was still on track to survive the night.

That Learn arrived at Perrone's without enough cocaine in her system to kill her is bolstered by what happened when she got there. Perrone said that the two had a suicide pact, which suggests that they both thought Learn needed to consume more drugs if she wanted to end her life. And after Learn injected herself with a dose of cocaine, Perrone himself made the judgment that what she had taken was not enough to kill her. According to his own statement, he gave Learn an additional 7.5 grams of cocaine because he concluded that she would not die unless she had more. He told the police that Learn convulsed and fell to the floor immediately after he injected her, and he later characterized what he did as "premeditated murder." In his stipulation of facts, Perrone admitted that Learn died "immediately after receiving the injection."

Given this evidence, Perrone cannot carry his burden of showing that it is more likely than not that no reasonable juror would have voted to find him guilty beyond a reasonable doubt. He is thus not entitled to relief on the ground that he is actually innocent of causing Learn's death.

## III.

Perrone also argues that his sentencing counsel was constitutionally ineffective for failing to tell him about (and possibly not even knowing about) *Hatfield*. Had Perrone been

aware of *Hatfield*, he says, he might have sought the court's permission to withdraw his plea on the ground that it was not knowing and voluntary. Because he did not know that the "death results" enhancement required the government to show but-for causation, he did not correctly understand what he was pleading to when he stipulated that he "caused" Learn's death.

To prevail on his ineffective assistance claim, Perrone must show both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On the performance prong, he "must overcome the 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Wyatt v. United States*, 574 F.3d 455, 458 (7th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689). On the prejudice prong, he must show that "but for counsel's errors, there is a reasonable probability that the result would have been different." *United States v. Graf*, 827 F.3d 581, 584 (7th Cir. 2016). In the context of a guilty plea, a petitioner demonstrates prejudice by "show[ing] that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). As with the first prong, there is a presumption that the petitioner has not suffered prejudice. *Graf*, 827 F.3d at 584–85.

Even assuming that Perrone could show "deficient performance" on the part of his counsel, it is unlikely that he could satisfy the "prejudice" prong. The evidence of causation was strong and his plea agreement gave him the opportunity to obtain a sentence reduction for cooperating with the government. The fact that he wants to withdraw from the agreement now—after he has already received an 80-

month reduction—does not mean that he would have wanted to do so before he received that benefit. The problems of proof he would face at resentencing make it doubtful that he would have put his deal at risk even if he had known about *Hatfield*. They also make it doubtful that the district judge would have permitted him to withdraw his plea. *See United States v. Underwood*, 174 F.3d 850, 852–54 (7th Cir. 1999) (noting that "[n]o defendant has an absolute right to withdraw a guilty plea" and that the utility of plea agreements would be undermined by allowing a defendant to renege based on his "reevaluation of his trial prospects").

At the end of the day, however, any difficulties Perrone has on the merits do not matter because his claim is barred as untimely. Although he was not required to bring his ineffective-assistance claim in his direct appeal, *Massaro v. United States*, 538 U.S. 500, 509 (2003), he was still required to comply with § 2255(f)'s statute of limitations. Under § 2255(f)(1), Perrone had to bring his claim within one year of his conviction becoming final, which means that his window closed in 2011.[5] He did not file his § 2255 petition until 2014. Other claims in Perrone's 2014 petition may have been timely based on the Supreme Court's 2014 decision in *Burrage*, but § 2255's statute of limitations runs separately for each claim. *Davis v. United States*, 817 F.3d 319, 327–28 (7th Cir. 2016). One claim's timeliness cannot cure another claim's untimeliness.

---

[5] Although § 2255(f) offers several different starting points for the one-year statute of limitations depending on the situation, no party contends that any starting point applies other than the day Perrone's conviction became final.

Perrone does not dispute that his claim is untimely. Instead, he attempts to escape the bar by contending that the government forfeited its statute-of-limitations defense. Perrone raised his ineffective-assistance claim before the district court for the first time in his reply to the government's response brief. He faults the government for not asserting the limitations defense in response, but the district court's local rules prohibited the government from filing a surreply. True, the district court chose to treat Perrone's reply brief as an amended petition, so it appears with the benefit of hindsight that the government could have filed a new response. But the filing was denominated as a reply brief, not as an amended petition; it did not reproduce the claims that had appeared in Perrone's original petition; and Perrone had repeatedly told the district court that his court-appointed counsel was not authorized to amend his petition. It was therefore reasonable for the government to conclude that it lacked the ability under the local rules to respond to the newly raised claim of ineffective assistance. And even if this were forfeiture, we would find it excused due to the understandable confusion in the district court. *See Wood v. Milyard*, 566 U.S. 463, 471 (2012) (allowing a court of appeals to consider even *sua sponte* "a nonexhaustion argument 'inadvert-ent[ly]' overlooked by the State in the District Court"). Because Perrone filed his petition after § 2255(f)'s statute of limitations had run, he is barred from raising that claim now.

## IV.

The district court also correctly denied Perrone's motion for an evidentiary hearing on his claims. A petitioner under § 2255 is entitled to an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show

that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). When the record before the district court allows it to resolve the petition without such a hearing, the petitioner is not entitled to one. *Rodriguez v. United States*, 286 F.3d 972, 986–87 (7th Cir. 2002) (affirming the denial of an evidentiary hearing when "[a] hearing would not have aided the district court"). Because Perrone has not raised any claim whose resolution requires an evidentiary hearing, the district court did not abuse its discretion in denying Perrone's request.

## V.

For the reasons stated above, the judgment of the district court is AFFIRMED.